# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

MICHAEL J. LINDELL,

      Plaintiff,

v.                                                                         Case No.

UNITED STATES OF AMERICA,
MERRICK GARLAND in his official
capacity as Attorney General of the United
States, ANDREW M. LUGER in his official
capacity as United States Attorney for the
District of Minnesota, and CHRISTOPHER
WRAY in his official capacity as Director
of the Federal Bureau of Investigation,

      Defendants.

## DECLARATION OF MICHAEL J. LINDELL

I, Michael J. Lindell, state the following as my declaration pursuant to 28 U.S.C. §1746:

1.    I am a citizen of the United States and a resident of the State of Minnesota.

2.    I serve as the chief executive officer of My Pillow, Inc. and have been in that position for several years.

3.    On the morning of Tuesday, September 13, 2022, at 4:00 a.m., I drove from my home in Minnesota with a close friend to go duck hunting in Iowa. After finishing our trip that same morning, I began driving both of us back home. At approximately 10:30 a.m., I pulled my truck into the drive-through window at a Hardee's restaurant in Mankato, Minnesota.

4.     As I started to drive away from the drive-through window to a parking space to wait for our food to be brought out, an unmarked car pulled rapidly in front perpendicular to my truck blocking the path ahead. I told my friend, "That's weird, something's wrong." The driver, who was in street clothes, wasn't even looking at us. A few seconds later, another unmarked car of a different make pulled up and stopped on the right side of my truck. The building was to the left of the truck. Then another unmarked car of a different make came up the drive-through and pinned my truck in from behind.

5.     The people in these cars were all dressed in street clothes.  I have been in dangerous situations before and started to fear for my life and my friend's life. I was prepared to ram the truck through the blockade.  I opened the driver's door, and said in a loud voice to raise attention of anyone in the area, "Who are you people? What do you want?"  One man stepped out of his car and "We're FBI and we need to talk to you."   I replied, "I don't believe you. Show me your badges," which he then did. That agent then directed me to pull out of the drive-through lane into another lane to the right of the drive-through.  I stepped out of my truck and said, "I want to see all of your badges." Two of the other three FBI agents then presented their badges. There were at least four FBI agents confronting me, and there may have been more, but I don't remember because I was so startled.

6.      I stepped out of my truck and told my friend who was very shaken up, "Let me take care of this, it'll be ok."  I asked the FBI agent who appeared to be the lead agent if they were going to arrest me, and he said, "No, we are just here to ask you questions." At this time, none of the agents said they were going to take my phone.  I also asked how

they tracked me to the Hardees from my hunting trip, and the lead FBI agent said he could not tell me. I had not told anyone else that I was going hunting that morning, much less where I was going hunting, other than my friend who joined me that day. Nor did anyone know that we were going to stop at the Hardees in Mankato, Minnesota upon the return trip.

7. One of the other FBI agents then went to talk to my friend who was still very shaken up, asked him for his identification, and took him out of my view. The three remaining FBI agents surrounded me, and the lead FBI agent then started asking me questions about Colorado, Dominion Voting Systems, Tina Peters, Dr. Doug Frank, my travels on my airplane nationwide and to Colorado, and evidence posted on my TV network news website, FrankSpeech.com. The information posted on Frank Speech that the lead FBI agent referred to includes the evidence showing that: (i) votes were manipulated in the Mesa County election management server, called an EMS for short, in two elections; (ii) Dominion had installed unauthorized software on the EMS that made it easy to manipulate large numbers of votes; and (iii) the Trusted Build software update performed by Dominion in May 2021 destroyed election records in violation of state and federal law.

8. During the questioning I asked the agents why they have allowed themselves to be weaponized like this and were bashing doors down like they did at the home of Sherronna Bishop, known as America's Mom, whose name also appeared on the warrant to seize my phone. One of the agents who I believe was from Colorado, said "Well, Sherronna did not open her door fast enough."

9.    This questioning lasted approximately 25-30 minutes. At no time did the agents read me my Miranda rights.

10.   At the end of this questioning, the lead FBI agent said "Well, Mike I've got bad news for you: we are going to take your cell phone." I responded, "No you are not, I'd rather be arrested, you are not going to get my phone because I run five businesses in this phone." At that time, the lead FBI agent produced papers he said were a subpoena and warrant to take my phone. I said, "How do I know these are real, I want to call my lawyer," and asked to call my lawyer. The lead agent said "no." I said that does not make sense because if I get arrested, I can call my lawyer—but since you said I'm not being arrested, I can't call my attorney and you can take my phone. I then said, "I'd rather be arrested." After a few minutes of arguing with the lead agent he said I could call my lawyer.

11.   I then called my attorney, Kurt Olsen. After speaking with Kurt, I decided to comply with the warrant and give my phone to the FBI. The lead agent then asked Kurt if he would permit me to consent to revealing my cellphone passcode to the agent to access the phone. Kurt said "no," and I did not consent. Before turning my cellphone over, I asked the lead FBI agent if I could back up my phone to the cloud so that I could make sure all my business-related information could be retrieved. The lead agent refused. I asked if I could check to see when my phone was last backed up, which another younger FBI agent checked at my request, and he noted that the last backup was made on September 8, 2022. I then turned over my cellphone to the FBI agents. I then asked when I would get my cellphone back and the lead agent said that he had "no idea." After I

objected again, he said "Mike, we are just doing our job." He then let me and my friend leave the Hardee's parking lot.

12. The subpoena to provide documents to a grand jury and the warrant were both signed on September 7, 2022.  I am unaware of any attempt by any representative of the U.S. Government to contact me about, or serve me with, that subpoena prior the FBI agents stopping me at the Hardee's restaurant on September 13, 2022.  Had any government representative attempted to serve me with the subpoena prior to the incident at Hardee's, I would have immediately accepted service.

13. In total, the FBI agents detained me and my friend for approximately 40-45 minutes.

14. My Pillow, Inc. is a subscriber to the cellular telephone services of Verizon Communications, Inc. The company has reassigned to me the cellular telephone number that was initially assigned to the company.

15. Except for face-to-face communications, I have depended on my cellphone for many years as my exclusive means of communication in my business and personal dealings. On my cellphone, I have passwords for specific apps and for my company financial accounts (e.g. to wire funds) that are not stored anywhere else (including the cloud). Not having my cellphone has already damaged my ability to conduct my business.  I typically receive and send hundreds of text messages a day. For that reason, the data collected on my cellphone is exceptionally voluminous and multifarious.  My hearing aids are also tied to this cellphone.

16.     The data that has been collected on my cellphone also includes years of communications with numerous attorneys from whom I have sought legal advice. A review of this extraordinary volume of communications with those attorneys would be exceedingly arduous and time-consuming.

17.     I oppose any procedure that would give possession to the United States Department of Justice of my attorney-client communications, or the other communications with literally hundreds of public and private figures related to a multitude of subjects including my investigations of election fraud across the Country.

18.     I have been engaged for more than a year and a half in organizing my fellow citizens in an effort to bring to light, to protest against, and to remedy the election fraud and irregularities that occurred in the 2020 presidential election and other elections, and to get rid of computerized voting machines.

19.     Through that effort, credible evidence of widespread election fraud and irregularities has been discovered across the Country.

20.     I have published that evidence and expressed my opinions publicly about matters of significant public concern for the past year and a half, especially relating to the need for election integrity, to get rid of computerized voting machines.

21.     I have associated with many other citizens who share my concerns and beliefs and support the effort to communicate those beliefs and concerns to the American public. A substantial number of those who have participated in the effort have expressed a desire to remain anonymous to avoid the harassment and intimidation that they have witnessed when other citizens have openly communicated those beliefs and concerns.

22. As a function of my effort to communicate concerns about election fraud and irregularities, I have produced and released four documentaries about election fraud and irregularities: Absolute Proof, Absolute Interference, Scientific Proof, and Absolutely 9-0. I also produced two multi-day televised events concerning election fraud and computerized voting machines, the Cyber Symposium held in August 2021 and The Moment of Truth Summit held in August 2022. Tens of millions of people have viewed these productions.

23. I have developed and launched an online media platform known as FrankSpeech.com to deliver news and commentary with a focus on election fraud.

24. To that end, I have sought to assure that the nation has fair and honest elections. I have worked with and helped organize Christian leaders, pastors, ministers, evangelists, and grassroots Christian activists to rally the Church to assume a leadership role in defending the integrity of our elections and to expose corruption.

25. I have appealed to elected officials to govern in accordance with Biblical principles.

26. The compelled disclosure of data collected on my cellphone will have a significant adverse impact on the activities that I have undertaken with many citizens who share my beliefs and concerns. Attempts by the Government to identify those who challenge the insistence of the Government that allegations of election fraud and irregularities are baseless and to harass and punish them has a chilling effect on the willingness of citizens to bring evidence of such illegal activities to light.

27. It is my belief that the need to continue informing the public about the evidence we have developed regarding fraud and irregularities in elections is essential to the preservation of our Republic.

I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated: 9/21/2022

Michael J. Lindell