UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                    )  COURT FILE
Michael J. Lindell and              )  NO. 22-CV-2290 (ECT/ECW)
MyPillow, Inc.,                     )
                                    )
              Plaintiffs,           )
                                    )
         vs.                        )
                                    )
United States of America; Merrick   )
Garland, *in his official capacity* )
*as Attorney General of the United* )
*States*; The United States Attorney)
for the District of Minnesota; and  )
Christopher Wray, *in his official* )
*capacity as Director of the*       )
*Federal Bureau of Investigation*,  )  Courtroom 3B
                                    )  Wed., October 19, 2022
              Defendants.           )  St. Paul, Minnesota
                                    )  10:00 A.M.
------------------------------------------------------------


**<u>HEARING ON</u>**


**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
AND FOR RETURN OF PROPERTY PURSUANT TO FED.R.CRIM.P. 41(g)**



**BEFORE THE HONORABLE ERIC C. TOSTRUD
UNITED STATES DISTRICT JUDGE**




**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S :**

For the Plaintiffs:        **PARKER DANIELS KIBORT, LLC**
                            By:  ANDREW D. PARKER, ESQUIRE
                            123 North Third Street - Suite 888
                            Minneapolis, Minnesota  55401


For the Defendants:        **OFFICE OF THE U.S. ATTORNEY**
                            By:  ANA H. VOSS
                                 CRAIG R. BAUNE
                                 Assistant U.S. Attorneys
                            600 United States Courthouse
                            300 South Fourth Street
                            Minneapolis, Minnesota  55415


                            **OFFICE OF THE U.S. ATTORNEY**
                            By:  AARON M. TEITELBAUM
                                 Special Assistant U.S. Attorney
                            1801 California Street - Suite 1600
                            Denver, Colorado  80202


                            **U.S. DEPARTMENT OF JUSTICE**
                            By:  JONATHAN E. JACOBSON
                                 Trial Attorney - Public
                                  Integrity Section
                            1301 New York Avenue NW - 10th Floor
                            Washington, D.C.  20005



            *     *     *     *

1          (10:00 a.m.)

2                    **P R O C E E D I N G S**

3                    **IN OPEN COURT**

4          THE COURT:  Good morning, everyone.  Please be

5     seated.

6          This is Michael Lindell and others versus United

7     States of America and others, Civil File Number 22-2290.

8     Let me invite appearances from counsel, starting with the

9     plaintiffs.

10          MR. PARKER:  Your Honor, Andrew Parker

11     representing Michael Lindell and MyPillow, Inc.

12          THE COURT:  Good morning, Mr. Parker.

13          MR. PARKER:  Good morning, Your Honor.

14          THE COURT:  And how about for the defendants?

15          MR. JACOBSON:  Good morning, Your Honor.  Jonathan

16     Jacobson for the United States.

17          MR. TEITELBAUM:  Good morning, Your Honor.  Aaron

18     Teitelbaum for the United States.

19          MR. BAUNE:  Craig Baune for the United States.

20          MS. VOSS:  Good morning, Your Honor.  Ana Voss.

21          THE COURT:  Good morning.

22          All right.  Here's how I'd like to handle things

23     today.  I've allotted up to two hours for the hearing today.

24     We could divide that with one hour for each motion, or if

25     you all want to take a little extra time with one motion or

1   the other, that's fine.  You don't -- please don't feel

2   compelled to take all of your time.  You're welcome to take

3   less if you're so inclined.

4        I thought we would start with the motion seeking

5   access to the search warrant materials and then move to the

6   motion for return of property and I suppose other relief.

7        So, Mr. Parker, let's hear from you first, since

8   it's your motion, on the request for access to the search

9   warrant materials.

10        I should say I do have questions.  I'll try to

11   insert them where they seem to fit in the outline of your

12   argument.

13        MR. PARKER:  Counsel, Your Honor, thank you for

14   your time.

15        Mike Lindell seeks access to the affidavit that

16   resulted in a search warrant in this case.  Our position as

17   it relates to public access is that the search warrant, or

18   the affidavit, may remain sealed to others, but because he

19   is the subject of the warrant, he has particular need and

20   interest and right to review of the affidavit.

21        This was specifically discussed by Judge Noel in

22   the *Up North Plastics* case in this district.  Prior to that

23   similar rules had been issued by a number of courts across

24   the country.

25        It's important to note, Your Honor, that Judge

1   Noel, of course, a magistrate judge for some 30 years on

2   this bench and very highly respected, issued that order in

3   1996, and since that time, Your Honor, that ruling has been

4   cited 23 separate times by different courts.

5              THE COURT:  Not always favorably.

6              MR. PARKER:  Not always favorably, but the vast,

7   vast majority favorably.

8              THE COURT:  Let's sort of skip to what matters

9   about that ruling or what I think matters about that ruling

10  and you can tell me if you disagree.

11             Judge Noel finds a Fourth Amendment right, but he

12  doesn't stop there.  He continues on to analyze the problem

13  in essentially the same way as I understand the First

14  Amendment and common-law access rights are typically

15  analyzed.  In other words, he looks to see what the

16  Government interest is and he asks whether the Government

17  has a compelling interest.  So whether a Fourth Amendment

18  right exists or not, you've still got to answer that second

19  prong, correct?

20             MR. PARKER:  That's correct, Your Honor.

21             THE COURT:  And it's no different here in this

22  case, even if I were to accept it, that reasoning, than it

23  is in the First Amendment or common-law context?

24             MR. PARKER:  No, we believe that it is different

25  and it goes to the point I made at the top, which is we're

1    dealing here not with access of the affidavit to the public.

2    We're dealing with the subject of the warrant.  And if this

3    Court were to allow the affidavit to be seen by the subject

4    of the warrant under a protective order, that that --

5                   THE COURT:  But how is the Government's interest

6    showing different in the Fourth Amendment context than the

7    First Amendment context?

8                   MR. PARKER:  Well, that interest is similar, but

9    the balance of the governmental interest versus the interest

10   of the party seeking the affidavit is different, because we

11   have a different party that is seeking the affidavit.

12                  THE COURT:  Okay.  Now that's -- okay.  Where do I

13   go to find that?  What case says that?

14                  MR. PARKER:  There is no case in this district and

15   I think the only case would be the Fourth Circuit case in

16   *Oliver* that may refer to it, but it is -- regardless, there

17   is no doubt that it is a difference when you're talking

18   about public-wide broad access and when you're talking about

19   an individual and only one individual.  And again, this

20   Court can issue a protective order that prevents that

21   individual from sharing it with anyone just as the Court

22   does in a number of other situations.

23                  But going to the Government's compelling interest,

24   we believe they don't meet that here as well because of the

25   public nature of this investigation as has already been

1       released and is out in the public.  So unlike some other

2       cases, this case doesn't have that sort of protection where

3       if you provide the information, it'll be the first anybody

4       sees it.  In this case the warrant itself, which is unsealed

5       and has been seen by many, has a whole list of individuals

6       who are involved as, quote-unquote, co-conspirators already

7       listed in the warrant.  The violations s that are being

8       alleged are already listed in the warrant.  The manner in

9       which the warrant was executed was done in a very public

10      manner, was widely described and discussed in the media.

11      Prior to the execution of the warrant, the coverage

12      related to -- and since the execution of the warrant -- the

13      coverage related to the Colorado investigation has been

14      widely covered with a broad range of information that has

15      been provided.

16              THE COURT:  So I thought the Eighth Circuit

17      addressed that argument in the *Gunn* case, or one of the two

18      *Gunn* cases, and said essentially that though there the

19      investigation regarding the defense contractors was fairly

20      widely known and relatively or comparatively public to, say,

21      an investigation of a single felon in possession of a

22      firearm or a single drug dealer, that it didn't really make

23      a difference there.

24              Am I misreading that or are you distinguishing

25      this case?

1          MR. PARKER:  Yeah.  I think it's much broader in

2     this case than it was in *Gunn*.  It's much more specific in

3     this case than it was in *Gunn*.  And again, the *Gunn* case was

4     dealing with public media access to information, whereas

5     this motion is dealing simply with the subject of the

6     warrant.  And I think that Judge Noel recognized that.  Yes,

7     it's true that he recognized that the governmental interest

8     test, if you will, and the least intrusive means test, the

9     two prongs that are required for the Government to

10    establish, apply in this situation.

11         THE COURT:  Well, and I'll go one further.  You're

12    suggesting that Judge Noel limited access to the warrant

13    materials there to the company, Up North Plastics, that was

14    the subject of the warrant and no one else, and I read his

15    order as unsealing those materials for all to see.

16         Are you right or am I right?

17         MR. PARKER:  No, I am not saying that.  I am not

18    saying that the *Up North Plastics* case says that.  I think I

19    referred to another case that referred to it.  But *Up North*

20    *Plastics* recognizes the rights of the warrant subject and

21    it's the leading case in this district on the point.  The

22    Eighth Circuit has not ruled specifically on that point.

23    But I think it is the better argument to suggest that the

24    subject of the warrant and the analysis by the court when

25    you are analyzing the subject of the warrant versus

1    governmental interest is different than the broad public

2    access of the First Amendment covered under **Gunn**.  So it is

3    a different analysis than it is under **Gunn**.

4            The primary --

5            THE COURT:  If I look at the -- sorry, Mr. Parker.

6    If I look at the string cite that's at footnote 2 --

7            MR. PARKER:  Yes.

8            THE COURT:  -- at page 4 of your brief where

9    you've got the Fourth Circuit case **Oliver** cited and those

10   other cases, I haven't looked at all those cases yet.  I've

11   looked at a couple of them.  But if I look at all those

12   cases, will I find cases in there that authorize a release

13   of a warrant only to the person that is the subject of the

14   warrant; in other words, that do what you're asking me to do

15   here?

16           MR. PARKER:  Yes.  If you look at those cases -- I

17   can't remember which of the four, but I believe one of them

18   did.  And again, Your Honor, the application in those cases

19   all resulted in the release of the affidavit.

20           THE COURT:  But you know what I'm asking, just --

21           MR. PARKER:  Yes, in terms --

22           THE COURT:  And you believe that one of them did.

23           MR. PARKER:  I cannot -- I cannot specifically

24   identify as I stand here.

25           THE COURT:  Okay.  Well, I'll take a look at them.

1   Thank you.

2        MR. PARKER:  Your Honor, it's interesting that in

3   our local rules -- I think it's 49.1 -- that the sealing of

4   documents and the type of documents that get sealed and

5   protected are listed, and I found it interesting that

6   affidavits for warrants are not listed there.  And in fact,

7   the court, this court, has ruled that routinely affidavits

8   of warrants are not sealed.  So it is not the presumption

9   that the affidavits are sealed and protected from both

10  public access, but certainly from the subject of the

11  warrant.  The opposite is the case.  And so the burden is

12  certainly on the Government to come forward with compelling

13  governmental interest, and simply saying, "Well, we have an

14  ongoing criminal investigation" is insufficient.  As the

15  court found, there needs to be specific detailed, factual

16  evidence in the record that the court can review and make a

17  determination based upon and that the appellate court can

18  then have the ability to review.  We don't have that in this

19  record.

20        THE COURT:  They've offered to give me the

21  records under -- or *in camera*.  You're suggesting I should

22  take them up on that.

23        MR. PARKER:  Well, you definitely should take them

24  up on it.  We believe we have a right to see that

25  information confidentially and under a protective order in

1    order to weigh in in terms of our view as it relates to

2    that.  In certain respects generally that should be the

3    case, but in this case in particular with the public nature

4    of the case and the warrant that is already open and

5    identifies the specific alleged violations, identifies the

6    individuals that are involved and being investigated.

7    Because of that, we believe this case doesn't meet the

8    compelling interest/least intrusive means standard.

9          It raises the question, Your Honor, I think, as

10   well:  There is no indicia in this case that Mr. Lindell is

11   a danger.  There is no indicia in this case that he has

12   destroyed documents or would destroy any evidence or data.

13   A subpoena would have sufficed in this case.  There was one

14   served at the same time.  The reason for this warrant being

15   used in the way that the Government decided to use it puts

16   them at risk of having to disclose the affidavit, and that

17   was a choice that the Government made, but it was not needed

18   in this case and certainly doesn't meet the least intrusive

19   means standard.  Whether redaction in this case would meet

20   that standard through a review, we really don't have the

21   ability to say because we don't have the information.

22          THE COURT:  When I read that argument, I mean,

23   there's sort of two pieces to that, but the thing that jumps

24   to mind is by making that argument, it strikes me that

25   you're suggesting that Mr. Lindell and his company would

1    have gone along with the subpoena.

2         MR. PARKER:  Yes, and we have --

3         THE COURT:  No objections, no nothing.

4         MR. PARKER:  Well, we would have -- we may have

5    objected depending on what the subpoena said and how it came

6    forth, and then the subpoena could have been challenged in

7    court as it normally would be and what should be provided

8    would be provided and there would be a process for providing

9    that information.  We'll get to that on the other issue

10   before the Court today as it relates to what the protocols

11   and the safeguards should have been in place as it relates

12   to a warrant and would certainly have been in place as it

13   relates to a subpoena and the potential challenge that could

14   have been made.

15        That's all I have, Your Honor.

16        THE COURT:  Thank you, Mr. Parker.

17        Counsel?

18        MR. JACOBSON:  Good morning, Your Honor.

19        THE COURT:  Good morning.

20        MR. JACOBSON:  Your Honor, I think you hit on some

21   of the key points that I would make today, which is really

22   that *Gunn I* and *Gunn II* control the outcome here, just as

23   they controlled the outcome yesterday when we were

24   litigating the issue of whether the newspaper had an

25   entitlement to a public release of the affidavit and the

1   search warrant materials.  At the end of the day, there is

2   no public entitlement to search warrant materials in the

3   midst of an ongoing federal criminal investigation where

4   privacy, reputational, and due process interests of

5   disinterested third parties, or third parties who are not

6   here before the Court, are at stake.

7           *Gunn* recognized a First Amendment right to search

8   warrant materials.  There's no doubt about that and we're

9   not hiding from that.  But what *Gunn* gave with one hand it

10  took back with the other by saying not during the

11  investigation, not during the investigation, and that's the

12  key point here today that I want to highlight for Your

13  Honor.

14          The notion that we're here sort of just saying

15  ongoing investigation, full stop; therefore, no access to an

16  affidavit, that's not what we're here for.  That's not what

17  I'm arguing.  Our facts and our affidavit -- I'm not sure if

18  Your Honor has seen it, but --

19          THE COURT:  So let me just disclose.  I could see

20  it.  Because of the nature of the ECF access that I have, I

21  can go push the buttons --

22          MR. JACOBSON:  Sure.

23          THE COURT:  -- in Judge Leung's case and see it.

24  But I think Mr. Parker might have a point here, which is

25  that you've offered an *in camera* review, and I think that --

1    to bolster your position that there's a compelling

2    Government interest, and I think that if that's the case,

3    then I ought to look at them *in camera*, and if there's some

4    appeal, then at least that information is then in this file

5    in this case and available for the Eighth Circuit to look

6    at.

7              Does that make sense?

8              MR. JACOBSON:  It does make sense.  And, Your

9    Honor, I think honestly it may be essentially compelled by

10   the case law, which requires you to make these specific

11   findings.  I'm not sure that you could just take our word

12   for it here today about the -- I mean, it'll be clear when

13   you review the warrant that what I say here today is

14   accurate, but I do think in order to make the specific

15   findings that enable effective appellate review, that you're

16   going to need to take a look over the affidavit.

17             THE COURT:  All right.  Then we're on the same

18   page there.

19             MR. JACOBSON:  And so with regard to some of the

20   key points that I want to make on **Gunn**, we're not here just

21   saying ongoing investigation, ergo, no public access, no

22   entitlement to the affidavit for the search warrant target.

23   Here, there were multiple factors that the **Gunn** court

24   considered in saying, you know, what types of considerations

25   justify keeping the document under seal.

1          First, the court said the affidavit was extensive,

2     it detailed the nature, the scope, the direction of the

3     Government's investigation.  Even a cursory review, Judge,

4     of this substantial affidavit would reveal that it's

5     identical to the one in *Gunn* as far as the degree of detail

6     that was provided.

7          The second concern that the *Gunn* court articulated

8     was reference to recorded communications.  We've got that

9     here to.

10          The third concern that the court articulated in

11     *Gunn* was that some of the information may have been obtained

12     from confidential informants or cooperating witnesses.

13     Again, that same interest is at stake here with regard to

14     the affidavit.

15          In *Gunn II* you have an even more -- a concern

16     about these privacy and reputational interests of folks who

17     were named in the warrant who may not even been named as

18     direct co-conspirators, but who were just indirectly named,

19     and the court -- even where the Government agreed to

20     unseal -- still said it would not be appropriate to do that.

21          Even if the Court were inclined to limit it just

22     to Mr. Lindell, there's still privacy and reputational

23     interests at stake.  If I were named in a search warrant

24     affidavit, even if it weren't going to be released to the

25     public, I don't want anybody to see the fact that I'm in

1    there, especially another person who potentially maybe I

2    would cooperate against.  It would give Mr. Lindell a window

3    into the investigation and it would allow him to compromise

4    the privacy and reputational interests of these other folks.

5          That's really what the *Gunn* -- that's what this

6    *Gunn* framework looks at and you can't circumvent it with

7    this Fourth Amendment analysis.  As Your Honor pointed out,

8    the same -- I mean, if you look at *Up North Plastics*, it

9    just incorporates the *Gunn* framework on the other side, so

10   the compelling interest that the Government needs to

11   establish is no different whether it's a First Amendment

12   right or a Fourth Amendment right.

13         And so, Your Honor, there's really at the end of

14   the day no way to get outside of *Gunn* here.  *Gunn* compels

15   sealing.  And not just sealing of the affidavit, but of all

16   the search warrant materials, all of which were at stake in

17   *Gunn*.  And it doesn't just -- and it doesn't permit

18   line-by-line redaction, because the same interests that the

19   Court articulated in *Gunn* that barred line-by-line redaction

20   in that case are at stake here.  And those interests, I can

21   walk Your Honor through them --

22         THE COURT:  Before you get to that, let me ask you

23   a question about our local rule, see if I'm understanding

24   this correctly.

25         The plaintiffs point out that under 49.1(d) -- and

1    I confess this is my first sort of detailed look at the

2    rule, so I could be missing something here.

3              The motion to seal is supposed to be publicly

4    filed and not disclose the information under a temporary

5    seal, and if I'm understanding the record in the MJ case, in

6    Judge Leung's case, that did not happen here.

7              MR. JACOBSON:  That's correct, Your Honor, that

8    the motion to seal is not public.

9              THE COURT:  Okay.  So I suppose the way to ask you

10   the question, because they've told me that I should care

11   about that, but they haven't been specific about exactly how

12   it affects things here, is why either shouldn't I care or is

13   this just a negligence, inadvertence, oversight situation.

14             MR. JACOBSON:  Well, at the outset I would say,

15   Judge, that a motion to seal a search warrant affidavit and

16   the search warrant materials, it has to be filed under seal,

17   before the search is executed, certainly.  If this rule were

18   read in the rigid fashion that they're proposing, presumably

19   it would mean on day one when we get the warrant we've got

20   to -- you know, we've got to publicly file the motion to

21   seal, publicly file the order, give the world notice of the

22   fact that we're about to execute a search warrant at this

23   residence or this premises, and, you know, that is obviously

24   a transparently ridiculous principle.  Even if the rule were

25   read more sensibly to suggest that maybe after execution now

1    you've got to put the stuff out on the docket, it still

2    would run into the problem that *Gunn* identified, which is

3    that the *Gunn* court said not just the affidavit, all of the

4    materials, all of the materials.

5           And so to the extent that this rule is

6    inconsistent with *Gunn*, ultimately *Gunn* is going to control.

7           THE COURT:  So implicitly you're suggesting that

8    we've got something for the Federal Practice Committee here

9    in our district to review and evaluate.

10          MR. JACOBSON:  I think that's fair to say, Your

11   Honor.

12          THE COURT:  Okay.

13          MR. JACOBSON:  Yes.  So I don't think the local

14   rules are going to shift the analysis material here, because

15   there's a settled framework in place for search warrants and

16   it certainly doesn't involve filing motions to seal the

17   search warrant publicly because the public's right of access

18   is going to trump the Government's investigative need and

19   safety of agents, frankly.

20          Should I return to the redaction point or --

21          THE COURT:  Please.  Sorry.  Thank you.

22          MR. JACOBSON:  No, that's fine.

23          With regard to redaction, I think that is -- it's

24   a genuine concern.  Is there a way to -- is there some less

25   restrictive manner that the public or Mr. Lindell could get

1    a look at this affidavit, and I think it's clear that the

2    case law provides that there is no meaningful way to redact

3    this affidavit effectively.

4           The *Gunn* court held that the affidavit in that

5    case shouldn't be redacted, that redaction was

6    impracticable, and the court highlighted three reasons why

7    that was the case and the three reasons sort of -- they're

8    similar to the three reasons that the court articulated

9    about why the affidavit should remain under seal in the

10   first place.

11          The first was a reference to recorded

12   communications.  We've got that here.

13          The second was a reference to individuals who were

14   described other than the subject of the search warrant.

15   Again, that's clear.  If Your Honor just takes an even quick

16   glance at the affidavit, it'll be clear that there is

17   descriptions about individuals beyond just Mr. Lindell.

18          And again, the third point that the court raised

19   was that -- the third reason why line-by-line redaction was

20   considered impracticable was that it would reveal the

21   nature, scope and direction of the Government's ongoing

22   investigation.

23          I took a look again this morning, Your Honor, at

24   the search warrant affidavit and was trying to envision a

25   universe where you could do line-by-line redaction, and it

1   really -- there is no way to render that document sensible

2   or readable in any way through line-by-line redaction.  And

3   so for the same reasons -- and I would highlight again,

4   there I'm talking about the *Gunn I* -- those three issues

5   were raised by the *Gunn I* court.

6           In *Gunn II*, the Government did in fact concede to

7   line-by-line redaction of the affidavit.  At that point they

8   were like a year and a half out from the search warrant, and

9   by the time the Eighth Circuit made its decision it was

10  almost two years after the search warrant.  The

11  investigation was effectively over.  The Government conceded

12  that its investigative objectives had largely been met.  The

13  Government conceded that line-by-line redaction would be

14  appropriate and the public ought to have access to the

15  affidavit.  And that was a discretionary decision, that the

16  Eighth Circuit said it was an abuse of discretion to permit

17  line-by-line redaction of that affidavit even with the

18  Government's consent, emphasizing that the privacy and

19  reputational interests that were at stake rendered that

20  line-by-line redaction inappropriate.

21          And so for those same reasons, I think, Your

22  Honor, that line-by-line redaction here is equally

23  inappropriate.  Even if the Government consented to it, even

24  if the Court permitted it, it may still be reversible error

25  in the Eighth Circuit under *Gunn II*.

1          And so, Your Honor, I think for those reasons

2     there really is no -- there's no basis to authorize

3     Mr. Lindell, who is the subject of a search warrant, to get

4     a window into the Government's investigation, to get a

5     window into other people's involvement in the scheme that's

6     described in that affidavit.  He has no entitlement to that

7     during an ongoing investigation.

8          And for that reason we would ask that Your Honor

9     keep the search warrant materials under seal at this time.

10          THE COURT:  Thank you, Mr. Jacobson.  Mr. Parker,

11     rebuttal, if you're inclined.

12          MR. PARKER:  Just a few comments, Your Honor.

13          I want to quote from the *Up North Plastics* case

14     after recognizing that you can borrow from the First

15     Amendment analysis when looking at the Fourth Amendment.

16     The court said:  "The Fourth Amendment requirement of

17     probable cause is meaningless without some way for targets

18     of the search to challenge the lawfulness of that search."

19          This is at the trigger of the difference between

20     public access, media access, that was sought in the *Gunn*

21     case.  And in addition, I would say Gunn himself, the

22     subject of the warrant, was not seeking the affidavit.  In

23     fact, he wanted it to remain sealed.  Entirely different, no

24     analysis of that in the *Gunn* case.  Judge Noel in finding

25     that it is, you know, meaningless if we're not able to get

1    access, at least some access, to the affidavit really

2    underscores that difference.

3            Second point:  The reason that the Government must

4    come forward with such specific findings is because of this,

5    and --

6            THE COURT:  Can I -- sorry, Mr. Parker.  I'm

7    looking at the quote in *Up North Plastics* that you just read

8    from.  Is there another court that has said the Fourth

9    Amendment requirement, or in words or substance, that that

10   Fourth Amendment requirement's meaningless without some

11   way -- and I'm reading in a little bit here -- for targets

12   of the search to challenge the lawfulness of that search

13   pre-indictment?  Is there another court that said that?

14           MR. PARKER:  Another beyond this court?

15           THE COURT:  Yeah.  I mean, that's a sweeping

16   statement, pre-indictment.

17           MR. PARKER:  Yeah, pre-indictment.  I do believe

18   that the cases that we have cited say that, and I believe --

19           THE COURT:  In that footnote?

20           MR. PARKER:  Yeah.  I think they are

21   pre-indictment, but again, as you can tell, my nimbleness

22   with those cases is not where it should be as I stand in

23   front of the Court, but certainly the review of those cases

24   would definitely be worthwhile.

25           I did also gather up all of the cases that have

1    cited the **Up North Plastics** case, as I indicated, and there

2    were 23.  One of them cited it and rejected it, only one.

3    Now, there were several that cited it and ruled in a

4    different way or on a different issue and so did not rule,

5    but there were at least ten of those cases that -- and we

6    can provide you with a list of those if it would be of

7    assistance to Your Honor -- that cited the opinion in **Up**

8    **North Plastics** favorably, and in fact, six of those cases

9    resulted in release of the affidavit.

10            The last point I want to make is to counter this

11   compelling governmental interest argument again and just

12   underscore that the warrant here has been open.  It's got a

13   lot of information in it.  The public nature of this, the

14   public nature of coverage, the way in which they decided to

15   seize the phone in such a public manner when it could have

16   been done otherwise, all of that has to play into whether or

17   not a seal is appropriate that prevents the subject of the

18   warrant from asserting his Fourth Amendment rights.

19            THE COURT:  Thank you, Mr. Parker.

20            Actually, Mr. Parker, I'll keep you up there.

21   Let's move to the motion for return of property.

22            MR. PARKER:  Your Honor, the warrant at issue in

23   this case is a modern-day general warrant.  It is improper

24   under the Fourth Amendment.  In fact, the Government

25   certainly has a right -- and we expect them -- to

1   investigate crime, but it must be within constitutional

2   boundaries, and this warrant, as carried out, was not within

3   constitutional boundaries and is not.  The Government has

4   taken Mike Lindell's cell phone and the entire contents of

5   the cell phone, whether they relate to what is listed in the

6   warrant or not.  All of it has been taken.  All of it is

7   being reviewed.  Now, by whom it's being reviewed, who

8   knows, and that's a problem.  That's an issue that makes

9   their warrant constitutionally lacking.

10          The Government has taken a cell phone that has

11   enormous data on it, because Mike Lindell operates his life

12   off of that cell phone.  Many people do, but he definitely

13   does.  And he told those executing the warrant that very

14   fact.

15          The proprietary records include the records for

16   five separate businesses that he runs.  He runs them from

17   his cell phone.  And if you know Mike Lindell at all, I'm

18   not surprised by that.  That's what he does.  He moves

19   quickly and does a lot of work through that cell phone, five

20   separate businesses.  His own personal financial

21   information, medical information, private personal

22   conversations with a whole range of people, all on that cell

23   phone.  Discussions with his lawyers riddled throughout that

24   cell phone.  Identities of people certainly included in that

25   cell phone.  All unrelated to what is identified in the

1    warrant that may properly be reviewed.

2            Now, what the law indicates in the difficult

3    situation of cell phones, the modern-day digital world that

4    we live in, if you take a look at it, pre-digital world, the

5    Eighth Circuit issued **In Re Grand Jury Proceedings (1983)**.

6    And it went through this concept of you can't go rummage

7    through someone's personal records in order to separate out

8    the wheat from the chaff on what your warrant calls for.

9            In that case it was seven years of bail bonds

10   records related to a business.  They went in and they took

11   all business records when they only had a warrant to look at

12   a portion of those records, and the Eighth Circuit went

13   through and analyzed that.  Since that time, the digital age

14   has hit us and the Government has been faced with having to

15   deal with often important information for criminal

16   investigations that are contained on cell phones.

17           *In re Search of Apple iPhone*, which is a district

18   court decision out of the District of Columbia in 2014 --

19   the first cell phone -- well, iPhone came out in 2007 for

20   just context, Your Honor.

21           In 2014, the District of Columbia issued this

22   ruling and it has been followed in many places as it relates

23   to how the Government needs to deal with in the digital age

24   cell phones and searches as it relates to cell phones.  The

25   court said that:  "The digital world allows for

1    particularity and avoidance of being overbroad because there

2    are sophisticated search tools."

3           You would think, well, it's the other way around,

4    how do you separate things out.  It used to be you go into

5    someone's house and you can search in places where the

6    information might logically be and that is allowed.  You can

7    even do more than that when it comes to the digital world

8    because of search tools that exist.

9           But what the court said is, in order for a warrant

10   not to be a general warrant, the Government must come

11   forward with its search protocols.  It must provide that to

12   the court in order that the court can determine whether or

13   not you can take the entire cell phone and you can go

14   through somebody's medical records and financial records and

15   everything unrelated to the criminality that is being

16   investigated, or whether you have to have these protocols

17   and follow them.  The court needs to be able to pass on

18   those protocols.

19          Well, in this case there are no protocols, there

20   were no protocols, and the Government will come up here and

21   say, "Oh, no.  We're doing this, that and the other."  Well,

22   they're making it up as they go along.  The court never

23   reviewed that, to our knowledge, and we never had access to

24   that.  None of the protocols or safeguards were ever -- nor

25   have they been -- provided to us.  What was provided was

1    what Mr. Lindell was handed, and what he was handed was a

2    warrant that identifies the items that they have a right to

3    seize.  There was no safeguard protocol added to the warrant

4    and the warrant is -- obviously it was part of the

5    complaint, but then it was included in our papers, I

6    believe, as Exhibit 1.  So *In Re Search of Apple iPhone* is

7    one of the leading cases as it relates to what the

8    Government needs to do in the digital age to avoid a general

9    warrant.

10          But then it comes to this district, and in fact,

11   in *U.S. vs. Moulder*, Judge Tunheim just a few months ago

12   dealt with this very issue, and he dealt with it in much the

13   same way that *Apple iPhone* dealt with it.

14          In the *Moulder* case he states that taking an

15   entire account and then parsing it is a general warrant.

16   You can't -- in that case it was taking an entire email

17   account and then sorting the wheat from the chaff.  He

18   determined that is a general warrant.  You cannot do that.

19   Similarly, taking an entire iPhone and trying to separate

20   the wheat from the chaff without identifying specific types

21   of procedural safeguards to use so that the Court can pass

22   on that is also a general warrant, and that's what we're

23   dealing with in this case.

24          The court talked about the two-step process that

25   I'm sure the Government is going to talk about today:  "No,

1  no.  We have a two-step process, so we protect this from

2  being a general warrant."  However, even a cursory view of

3  the *Moulder* case shows that the two-step process that the

4  Government used there just a few months ago and used in this

5  case as well is insufficient.  It does not pass

6  constitutional muster.  Step two is okay, but taking the

7  entirety of the cell phone and not having a process for

8  determining what is responsive to the warrant -- because the

9  warrant did identify with some particularity it could be

10  argued.  We think the warrant was already overbroad, two

11  years of texts and everything, two years of everything on

12  the cell phone, as well as items listed from A to X

13  throughout were very similar to what was found invalid in

14  the *iPhone* case.

15        But as it relates to *Moulder*, step one was the

16  problem because there were not safeguards.  As the court

17  said:  "The Government cannot ask for every piece of

18  information related to Moulder's email account without

19  having probable cause to access all that information."

20        And the court even went so far as to say:

21        "The court has considered whether holding that the

22  email search warrant was unconstitutionally overbroad will

23  burden the Government in execution of search warrants going

24  forward.  The court does not believe it will."

25        That is an issue that the Government will likely

1    raise.  "Oh, if we're required to have these safeguard

2    protocols and go through this entire process, it's going to

3    be overly burdensome for every investigation," which

4    includes a cell phone, and most -- many might -- include

5    cell phones.  Too burdensome.  Well, the Constitution

6    doesn't take a back seat to burden.  The Constitution

7    requires sometimes that they take an extra step and that

8    they establish protocols and safeguards and that those are

9    reviewed by the court before they are able to take from

10   someone their cell phone, which oftentimes is really their

11   data life in full.

12           Now, the court identified in *Moulder* some ways in

13   which safeguards or protocols could be articulated, and

14   keyword searches could be done in order to separate down,

15   et cetera.  We would say at a minimum the Government should

16   not be allowed to get any of Mr. Lindell's information until

17   a third party has reviewed, and we would be open to a

18   special master being put in place in this case in order to

19   separate out so that the Government doesn't violate

20   Mr. Lindell's Fourth Amendment rights or, for that matter,

21   his First Amendment rights.

22           I want to move on to -- setting aside now for a

23   minute the general warrant issue, the issue of

24   attorney-client privilege will likely come up and the

25   Government may well say, "Oh, no, no, no.  We have a filter

1  team and because we have a filter team that takes care of

2  the general warrant issue." No, it doesn't. It doesn't

3  come anywhere near taking care of what was discussed in

4  *Apple iPhone* or in the *Moulder* case. In fact, it talks

5  about safeguards and a number of indicia related to

6  procedural safeguards, listing how the phone's going to be

7  imaged, the process, the team or the special master that is

8  going to review it, that they would allow. The relationship

9  and what information does the investigative team get. All

10  those things need to be listed. The search terms, as I

11  mentioned before, when the process will be completed in

12  order that the property can be returned. All of those

13  things are suggested as being important.

14        In terms of a filter team, having somebody else in

15  the Government review other than the investigative team does

16  not resolve at all the violation that is at issue of the

17  Constitution. In fact, that has been not specifically ruled

18  on, but it has been commented on by Judge Tunheim in the

19  *Heppner* case where he agreed with Judge Noel, saying that,

20  in fact, that sort of filter-team process is somewhat like

21  the fox guarding the hen house, and we would agree with

22  that. The Fourth Circuit in 2019 in *In re Under Seal*

23  *(Search Warrant)* specifically rejected that type of filter

24  process for determining attorney-client privilege.

25        And by the way, that filter process doesn't deal

1    at all with all the other information that the Government

2    has no right to of Mr. Lindell's.  And I've gone through the

3    list, but it's broad, much broader than just his discussions

4    with a lawyer.  At a minimum a filter team has to include a

5    special master, in our judgment.

6              Thirdly -- actually fourthly --

7              THE COURT:  Every case where a cell phone is

8    seized?

9              MR. PARKER:  I'm sorry, Your Honor?

10             THE COURT:  Are you suggesting that a third-party

11   neutral is required in every instance where a cell phone is

12   seized?

13             MR. PARKER:  No, I am not suggesting that.  I'm

14   suggesting under the facts of this case there can be no

15   doubt, because --

16             THE COURT:  What makes this case special?

17             MR. PARKER:  What makes it special is the amount

18   of information, the type of information that is on that cell

19   phone.  Not everybody is going to have or carry or include

20   on their cell phone all of what Mr. Lindell has on his cell

21   phone.  Most people will have some things beyond the

22   warrant, but maybe not, and it depends on what the warrant

23   calls for.  But if it is a situation in which someone does

24   have information beyond and if that's the majority of

25   situations, yes, it's got to be somebody outside of the

1    Justice Department that provides for that.  This circuit,

2    this district, has never ruled that a filter team is

3    sufficient and works or operates.  And in fact, in our

4    review, at least, in the *Heppner* case, Judge Tunheim was

5    very, you know, critical or looked at it with a jaundiced

6    eye, it seemed.

7          The execution of the search warrant also raises --

8          THE COURT:  I have to ask because you said the

9    district's never done something.  So if I go do a Westlaw

10   search and I start poking around for decisions that have

11   denied motions to suppress on this ground, I'm not going to

12   find one?

13         MR. PARKER:  My comment is only as it relates to a

14   filter team.  I don't believe -- and, you know, whether we

15   missed it or not, it's possible, but I can say we looked.

16         THE COURT:  You did that search.

17         MR. PARKER:  We did.

18         THE COURT:  Okay.  All right.  Well, I respect

19   that.  I get that.  Okay.  Thank you, Mr. Parker.

20         MR. PARKER:  Looking at execution of the warrant

21   itself, we find other constitutional violations related to

22   the execution.

23         First --

24         THE COURT:  Okay.  So I get this.  I get where

25   you're going and I've got sort of a couple of fundamental

1    questions here that I think now is the time to ask.

2             The first is that the basis for the motion

3    originally, it was 41(g).

4             MR. PARKER:  One of the bases.  I think we also

5    included a challenge to the warrant itself under the Fourth

6    Amendment.

7             THE COURT:  Well, the reason I'm sort of stuck on

8    41(g) is the title of the motion.

9             MR. PARKER:  Yes.

10            THE COURT:  Motion for a TRO and for return of

11   property pursuant to Federal Rule of Criminal Procedure

12   41(g).  So, are you -- I don't think you're walking away

13   from that now.

14            MR. PARKER:  No, we're not.

15            THE COURT:  Okay.  You've got 41(g) over here and

16   it has standards and factors that I'm supposed to apply to

17   determine whether property in this situation should be

18   returned.  And then you've got these what I'm going to call

19   freestanding constitutional arguments over here that it

20   seems to me you're asserting separately.

21            Ordinarily -- and sorry.  I could be missing

22   something really basic here.  I'm not saying that -- I'm

23   genuine when I say that.

24            Ordinarily when constitutional arguments are

25   raised, there is some other legal principle in play that

1     permits them to be raised:  1983, a **Bivens** action, a

2     proceeding where you are challenging the admissibility of

3     evidence post-indictment in a criminal case.

4              Can you cite a case where a court's accepted

5     freestanding constitutional arguments like this as a ground

6     to challenge some action, particularly in an investigatory

7     phase, that the Government's undertaking?

8              MR. PARKER:  I think both the **Apple iPhone** and the

9     **Moulder** cases are talking about --

10             THE COURT:  But the **Apple iPhone** case is an

11    application for a search warrant, right?  And the magistrate

12    judge in the District of Columbia, who's a big e-discovery

13    person, that's his area, is saying:  No, I'm going to deny

14    it and I'm going to write about why I'm denying it,

15    presumably so that going forward the Government in the

16    District of Columbia knows, at least when you're in front --

17    well, wherever that's at today, I'm not sure, but at least

18    there that's the standard.  Different procedural context.

19    We're past that here.

20             MR. PARKER:  We are past that.  I believe you have

21    a right as the subject of a warrant that has been issued to

22    challenge that warrant in court in a preliminary injunction

23    procedural posture.

24             THE COURT:  That that's where I need the case.

25    That's where I'm asking about do you have a case.

1            MR. PARKER:  Not specifically in this district.

2    Actually, I would have to look at whether that procedural

3    posture that we're sitting in right now -- we have not

4    looked at that.

5            THE COURT:  So I've poked around some and I

6    haven't found one.

7            MR. PARKER:  And we would -- you know, we would

8    have to look at it.  The **_Moulder_** case was in I think a

9    similar posture, although not an injunction.

10           THE COURT:  **_Moulder_** is post-indictment.  **_Moulder_**'s

11   a criminal procedure.

12           MR. PARKER:  It's a criminal procedure case on the

13   email search warrant.  Yeah, you're right, Your Honor.

14           THE COURT:  Suppression.

15           MR. PARKER:  It deals with the Fourth Amendment,

16   but it's post-indictment.  So you're saying we have to wait

17   until indictment in order to challenge the search warrant.

18   I don't -- I just -- I would have to look specifically at

19   that question and I would ask for the ability to be able to

20   brief that question, because I would be surprised that if a

21   search warrant is facially invalid, it's obviously invalid,

22   it was executed in an obvious unconstitutional way, that the

23   Government can do that with no recourse by the recipient for

24   months and months and maybe ever if they never are indicted,

25   and I just don't think that's the law.

1          THE COURT:  Well, you could in theory have a

2     *Bivens* damages action down the road.  You could in theory

3     have a 1983 action if you're looking for damages, and again,

4     if you're I suppose indicted and cleared or not indicted at

5     all, but --

6          MR. PARKER:  Meanwhile, your --

7          THE COURT:  You see what I'm asking.  I'm not

8     saying, "I know you don't have this right."  I'm asking a

9     question, which is:  Aren't you asking for relief here that

10    is, if not unprecedented, all things considered,

11    comparatively rare.

12         MR. PARKER:  I'd like to be able to review that

13    issue and I don't think that the procedural posture of this

14    case we have looked at closely.  I do think that the

15    constitutional analysis can be used in support of 41(g) as

16    well, which specifically identifies an avenue for redress at

17    this time.

18         If the Court -- you know, I was going to go into

19    execution of the warrant.

20         THE COURT:  Certainly.  No, I don't mean to cut

21    you off.  I thought that was an appropriate time to raise

22    that concern or that question.

23         MR. PARKER:  Fair enough, Your Honor.  It

24    definitely is important for us to respond to that.

25         The execution of the warrant, you have plain

1    automobiles, no marked squads, plainclothes individuals

2    surrounding Mr. Lindell's vehicle.  There's nothing in the

3    record to indicate what the basis for that was.  There's --

4    this is not a case involving, you know, drug warlords or

5    some sort of danger to the public scenario.  It's not a case

6    where somebody has ever fled or shown a propensity to

7    destroy or hide information.  We don't know of any of that.

8    It's done in a public place as well as if one of those

9    things might occur.

10         They detained him in custody, unable to leave, for

11   45 minutes.  The first 25 to 30 minutes were asking him

12   questions while he was in custody, questions specifically

13   focused on this investigation.  This is all prior to the

14   warrant being executed, so it was separate from the purpose

15   of their detaining him to execute the warrant.  He was not

16   Mirandized.  He was not allowed -- at least for some time --

17   to call his lawyer.

18         It raises a number of constitutional issues and

19   goes to the First Amendment issue of why that was done.  Was

20   there an emergency that this needed to occur at that moment

21   at that location in the way that it occurred?  Was there

22   something imminent that required that to happen?  Were there

23   destruction indicators or indicia?  Was there some sort of a

24   compromise of the investigation if it were not done that

25   way?  We have received no response to that in the record to

1    date in this case.  The question of whether the standard

2    here of *Davis v. Dawson* in terms of the least intrusive

3    means of effectuating a stop, whether to execute a warrant

4    or ask questions of someone, did not occur in this case.

5            THE COURT:  How do you respond to the point that

6    the Government makes that your client went and talked

7    publicly about the event and described the agents in

8    positive terms?

9            And I suppose another factor here that I haven't

10   thought about, but I'm thinking about it now, is that I

11   think your client's admitted at least that he had firearms

12   in the car.  He was duck hunting, correct?

13           MR. PARKER:  He was.  He was duck hunting.  That's

14   a reason not to do it the way that they did it.  There is no

15   indication that this person has ever had any violent

16   tendencies.  The fact that he is a duck hunter does not give

17   grounds to do this.  In fact, it created more of a danger.

18   Who are these people?  His life has been threatened in the

19   past --

20           THE COURT:  What about his public statements to

21   the effect --

22           MR. PARKER:  In terms of the public statements,

23   you can violate somebody's constitutional rights politely.

24   That can happen.  And it does not change the Constitution or

25   the manner.  And frankly, it doesn't change the intimidating

1      element of this whole public issue.  The fact that he has

2      made these violations public and whether or not he is

3      intimidated, the associates that he has on his phone, that

4      people see this happening, could well be intimidated and it

5      could squelch his ability to associate with people.  They're

6      going to go, "We're not going to have anything to do with

7      him."

8              This was reported separate from Mike Lindell.  He

9      wanted it to be reported the way that he knew it occurred,

10     not by the media sources and what their spin or narrative

11     might be.  So it was going to be reported, it had already

12     been reported on widely across the country in terms of what

13     happened irrespective of what his comments were shortly

14     after.

15             There's a question that arises that we again are

16     hamstrung at knowing the answer to in terms of how the

17     Government found Mr. Lindell in a place that he has either

18     never been or very, very seldom has ever been, in Mankato,

19     Minnesota, at this particular Hardee's, and it raises the

20     specter -- and that's all -- as to understanding what the

21     legitimate manner of locating him was.

22             In a similar vein, we've heard about recordings

23     that exist as it relates to this investigation, and that

24     indicates that there may be wiretapping going on as it

25     relates to this investigation.  We don't know that as well,

1    but we believe we have the right as the subject to know

2    whether or not that sort of conduct has occurred and whether

3    it was appropriate to have occurred.

4         Finally, I just want to comment -- and maybe our

5    papers do this sufficiently -- as it relates to the

6    *Younger*/*Deaver* doctrine that the Government has raised,

7    claiming that we are attempting to interfere with and/or

8    enjoin the entire Government process of investigation.

9    That's not what we're doing.  We just want our stuff back

10   and the data not to be accessed, because the warrant in this

11   case was improper.  It was improper under 41(g), it was

12   improper under the Constitution, and therefore the

13   information should not -- which is still in the possession

14   of the Government -- shouldn't be allowed.

15        THE COURT:  So I understand the distinction you're

16   trying to make there, Mr. Parker, I think, but I guess I

17   need authority for that.  *Younger* doesn't say you're not

18   interfering with -- I'm not aware of a line of cases

19   applying *Younger* that say you're not interfering with the

20   Government -- an ongoing criminal investigation or an

21   ongoing criminal proceeding if you only ask for the

22   Government not to have access to key pieces of evidence or

23   evidence it thinks might be important.

24        MR. PARKER:  Your Honor, *Younger* does not say that

25   if the Government acts in an unconstitutional manner that

1   the court has found unconstitutional, that they can continue

2   to proceed with the information that they have obtained.

3           THE COURT:  Well, I think in some respects that's

4   exactly what it says.  In other words, it's an abstention

5   doctrine, right?

6           MR. PARKER:  Yes.

7           THE COURT:  It's telling you that I ought to

8   abstain for some period of time and allow things to run

9   their course even if there is an arguable constitutional

10  violation, and then there is a procedure later whereby that

11  arguable constitutional violation gets adjudicated.  I think

12  that's exactly what **Younger** says.  If I'm wrong about that,

13  I need authority.

14          MR. PARKER:  Yes, and I think in our briefing we

15  provide the response to **Younger** in some detail as it relates

16  to the briefing, if I may.

17          THE COURT:  You may, absolutely.

18      (Pause)

19          THE COURT:  I'm looking through -- oh, here we go,

20  page 19 of your reply brief.

21          MR. PARKER:  And we also raised the **Lewellen**

22  decision.  **In re Grand Jury Proceedings** is cited, Your

23  Honor, as well as the **Lambert** case.

24          Now, the **Lewellen** and the **Z.J.** cases also provide

25  exceptions to **Younger**.  They were showing that a

1    prosecution -- so they were post-indictment -- was brought

2    in retaliation for or to discourage constitutional -- the

3    exercise of constitutional rights would justify an

4    injunction.  That is the holding in **Lewellen**.  You find that

5    on page 18 of our papers.

6            But I would cite you to those cases that we have

7    cited, **Doran**, **Lambert**, and the **In re Grand Jury Proceedings**

8    as it relates to the **Younger** doctrine.

9            Thank you, Your Honor.

10           THE COURT:  Thank you, Mr. Parker.

11           Mr. Jacobson?

12           MR. JACOBSON:  So, Your Honor, I want to step back

13   for a minute and kind of look at what's happening from a

14   high-level, sort of a bird's-eye view of what's happening.

15           The Government's warrant and the execution of that

16   warrant were routine and unexceptional.  What is exceptional

17   is what's happening here today as Your Honor has recognized

18   in response to that warrant, a deluge of litigation.  Over

19   the course of three weeks a TRO motion that Your Honor had

20   to respond to within a day, a P/I motion, a motion filed two

21   weeks later to get a copy of the affidavit that was

22   purportedly necessary in order to effectively litigate the

23   P/I motion, a motion to expedite the motion to get the

24   affidavit that was already late-filed.  And all of this

25   litigation is occurring over what, over a search warrant

1    that looks like every phone search warrant, Your Honor, that

2    you've ever seen, a search warrant that was by all accounts

3    executed professionally and respectfully by federal law

4    enforcement.

5              We are not genuinely here today because of

6    anything that the Government did.  We are here today because

7    of who the plaintiffs are, and because they believe that

8    their speech on matters of public concern, that resembles

9    speech that many of us have on matters of public concern,

10   entitles them to some kind of special treatment here in this

11   courtroom in civil litigation, in criminal litigation, and

12   that's really ultimately why we're here today.

13             At bottom, the plaintiffs cannot win on this

14   preliminary injunction motion at the highest level for the

15   reason that Your Honor identified and that I just did not

16   hear a good response to, which is these freestanding

17   constitutional claims have no precedent.  They are extremely

18   unusual.  You can't just come into court and say, "The

19   Government violated my First Amendment rights.  I need a

20   declaration that that happened.  The Government violated my

21   Fourth Amendment rights.  I need a declaration that that

22   occurred."  That's not how you invoke Article III

23   jurisdiction, and that kind of abusive process is a core

24   problem here with this litigation, with this lawsuit.

25             The Government respected the plaintiffs' rights.

1       The Government obtained a warrant here, a neutral,

2    disinterested magistrate, Magistrate Judge Leung.  He

3    determined that there was probable cause on the basis of the

4    affidavit that we provided.  And so ultimately the

5    plaintiffs are unlikely likely to succeed on any of these

6    unusual constitutional claims, the irreparable harm and the

7    public interest factors.  Ultimately, it was clear from the

8    briefing, I think, that they rise and fall with a

9    determination on likelihood of success.

10          The plaintiffs also cannot be successful on this

11   41(g) motion to obtain the cell phone because they can't

12   meet any of the factors.

13          THE COURT:  Well, if I'm asking the question the

14   right way, I think the answer is that the preliminary

15   injunction motion rises or falls on the 41(g) analysis.

16          MR. JACOBSON:  So, Your Honor, the way we -- I'm

17   sorry.  Go ahead.

18          THE COURT:  One and done.  In other words, once I

19   evaluate the constitutional claims as part of that, whether

20   there's a callous disregard for constitutional rights as I

21   understand the law, that's it.  There isn't a case out there

22   that supports this motion that in addition to or aside from

23   Rule 41(g) I look at or consider alleged constitutional

24   violations in this context.

25          MR. JACOBSON:  So, Your Honor, the way we've --

1    and I think that's a perfectly fair way to conceptualize it

2    given the packaging of this Complaint, because the Complaint

3    has five counts and they're all freestanding constitutional

4    counts, right?  And so where is 41(g) there?  And Your Honor

5    recognized this in your order denying the denying the TRO,

6    which is where exactly does 41(g) play out in the context of

7    the constitutional claims.

8            The way the Government has conceptualized it and

9    the way we briefed it is, there's a 41(g) claim and it's a

10   freestanding 41(g) claim and there would be jurisdiction in

11   this court to potentially entertain, you know, ancillary

12   equitable jurisdiction to entertain the 41(g), and then

13   there's the five counts, but that's being potentially

14   generous to the plaintiffs because that's not technically

15   the way they packaged the litigation.

16           THE COURT:  Well, and that's why I'm asking the

17   question.  If I'm wrong, then I need to know, right, because

18   there are two ways to handle the 41(g) petition:  one,

19   fast-track it, decide it on the merits; two, seek a TRO,

20   failing that a preliminary injunction, which is what the

21   plaintiffs here have done.  If there is some legal

22   foundation for the assertion of independent, freestanding

23   constitutional claims apart from 41(g), then I need to

24   consider them and I need to know about that.  That's why I

25   asked Mr. Parker that question and that's why I'm raising it

1   now.  It seems like a really important issue.

2            MR. JACOBSON:  Your Honor, from the Government's

3   perspective there is no basis to invoke the Court's

4   jurisdiction on the five freestanding constitutional claims.

5   If you're being generous to the plaintiffs here, there is a

6   mechanism to get into court on the 41(g) if it had been like

7   it was in *Wilansky*, for example, a 41(g) claim.  They

8   brought a civil lawsuit saying under 41(g) we get the

9   property back and here's why.

10           And so I guess, Your Honor, I think the easiest

11  way to analyze this is to analyze the free -- and again,

12  this is being generous to the plaintiffs -- is to analyze

13  the constitutional claims separately from the 41(g).

14  Ultimately, it doesn't matter how Your Honor chooses to

15  package it.  That's the way we've briefed it, that's the way

16  we've conceptualized it, is that these are distinct avenues

17  to invoke the Court's jurisdiction, the five counts claiming

18  constitutional violations and the 41(g).

19           THE COURT:  Okay.  And then in terms of that, I

20  mean, *Younger* is an abstention doctrine.  I would think that

21  that's where I've got to start.

22           MR. JACOBSON:  That's correct, Your Honor, at

23  least with respect to the constitutional claims.  I don't

24  believe that *Younger* is going to bar him from getting in on

25  the 41(g).

1          THE COURT:  Right.

2          MR. JACOBSON:  And so, Your Honor, I think I'll

3     start with the P/I briefing, again conceptualizing it the

4     way that we've done it, which is the P/I is separate from

5     the -- or the five freestanding counts are separate from the

6     41(g), so I'll divide my argument between the P/I issues

7     that are raised on the five counts, the likelihood of

8     success, irreparable harm, et cetera, and on the other hand

9     the 41(g) issues.

10          And with regard to the freestanding counts, **Deaver**

11     and **Younger**, these cases apply.  They bar the Court from

12     issuing the kind of relief that Mr. Lindell is asking for

13     even if there were some legitimate avenue to invoke the

14     Court's jurisdiction here.

15          The Court already recognized, I think, in the

16     citation to the Eleventh Circuit's **Trump** decision that -- I

17     think Your Honor understood what Plaintiffs were trying to

18     do, and that is to enjoin the federal criminal investigation

19     here.

20          There's a line from **Deaver** that I think is

21     particularly applicable here, and the line is:  "Prospective

22     defendants cannot, by bringing ancillary equitable

23     proceedings, circumvent federal criminal procedure," and

24     that is exactly what's happening here.

25          The plaintiffs' argument is that:  Well, no, we're

1    not -- you know, *Younger* doesn't apply because we're not

2    trying to enjoin the criminal investigation.  We just want

3    our stuff back I believe is what I heard today, but you have

4    to think about the practical impact of a determination that

5    they're entitled to relief here.

6              Let's say Your Honor granted declaratory relief

7    and said:  "You know what?  I agree with you, Plaintiffs.

8    The phone couldn't be taken because it was a violation of

9    his First Amendment rights, and the reason is because the

10   Government is retaliating against Mr. Lindell for his speech

11   on matters of public concern."

12             What conceivable investigative step could be taken

13   to -- what legitimate investigative step could be taken by

14   the federal government to investigate Mr. Lindell's

15   activities, whatever they were, after a ruling like that?

16   It's --

17             THE COURT:  Sorry.  And what's the limiting

18   principle?

19             MR. JACOBSON:  There is no -- he would wield that

20   ruling to bar any investigation into him.  It would immunize

21   him from federal criminal investigation.  And that's why,

22   Your Honor, I think at the end of the day, the practical

23   impact of what he's seeking is an injunction against the

24   federal criminal investigation and that's exactly what

25   *Deaver* bars.  That's the kind of behavior that *Younger*, the

1    kind of judicial action that *Younger* is counseling against.

2          Your Honor, in terms of the avenues that they

3    proposed for circumventing *Younger*, I heard three things

4    today.  I heard *Lewellen*, I heard, I guess, the *Lambert*

5    decision, and *In re Grand Jury Proceedings*.

6          If Your Honor were to take a look a close look at

7    the *Lewellen* case, this is a case -- and I'm looking for my

8    own brief on it, but I can't find it, but the case involved

9    a small-town investigation into and prosecution of an

10   attorney who was representing a black minister.  And the

11   attorney had been subjected to mistreatment in that -- there

12   was a six-day hearing, I think, where the attorney was

13   subjected to mistreatment because he was advocating on

14   behalf of this black minister client.  And in addition,

15   there was an implication from the hearing that the

16   Government had indicted the black attorney in order to

17   impact his Senate campaign.  So there was Government --

18   there was a six-day hearing.  There was a strong nexus

19   between the indictment of the individual and his protected

20   activity, defending his client in -- it was rape litigation.

21          This is a far cry, I think, from what happened in

22   *Lewellen*.  There is no nexus, no nexus other than pure

23   speculation, Your Honor, between on the one hand

24   Mr. Lindell's speech on matters of public concern and on the

25   other hand the search warrant.

1    In terms of the other cases that were cited to

2 circumvent **Lewellen**, there was the **Lambert** decision.  This

3 was a case where the -- there were -- it was a small-town

4 murder -- or a beating of some kind.  It was caught on video

5 by an individual, just a third party videotaped the event.

6 The police took the video and refused to give it back to the

7 individual, and there was no search warrant or anything like

8 that.  And this individual sued the police department to get

9 a copy of the video back, saying that he had a First

10 Amendment right to distribute the video, to sell the video,

11 and the court determined that, yes, they would require the

12 Government to return the video, but the reason they did it

13 was because there was no search warrant to obtain that

14 video.  There was no -- the video was not lawfully in the

15 Government's possession and the individual was being barred

16 from exercising his First Amendment right, distribution of

17 the video.

18    Here, there is a search warrant to obtain

19 Mr. Lindell's phone, probable cause was found, and in

20 addition, he can exercise his First Amendment rights all day

21 long, and since this warrant was executed, he's been doing

22 that, Your Honor.  So, you know, you can see that.  That's

23 in the record in Exhibit 1 from our opposition, is even the

24 night after the search warrant he's out talking about the

25 warrant, so he hasn't been chilled, he hasn't been barred

1   from exercising his First Amendment rights, and there's no

2   nexus between his speech and the search warrant here.

3            The third case that was cited to purportedly get

4   around the *Younger* decision was *In re Grand Jury*

5   *Proceedings*, which I don't believe has any relationship to

6   *Younger*, but I'll distinguish it anyway, because the case

7   relates to the plaintiffs' argument about an overbroad

8   warrant.

9            In that case there was an investigation into a

10  bail bond entity, a bail bondsman, and the warrant

11  essentially allowed the Government to seize seven years of

12  documents.  They went in and took an enormous number of

13  documents.  There was no real limitation to what they could

14  take.  The warrant did not even specify the offenses that

15  were at issue, didn't even say:  This bail bondsman violated

16  statute A, statute B, statute C.  It did not list specific

17  individuals who were purportedly involved in the event.  And

18  it didn't list any files, any specific files that were at

19  issue in the litigation.

20           So in our case, Your Honor, of course we listed

21  the statutes.  Of course we listed the list of individuals.

22  Our Attachment B is detailed about exactly what it is we

23  want on Mr. Lindell's phone, and the circumstances just

24  could not resemble any less the circumstances in *In Re Grand*

25  *Jury Proceedings*, the 1983 Eighth Circuit case that in any

1    event has nothing to do with *Younger*.  So *Younger* applies,

2    Your Honor, *Deaver* applies, and this is an effort to

3    undermine a good-faith federal criminal investigation.

4           I want to talk about -- I can walk through

5    likelihood of success on each of the counts or I can focus

6    on the ones that Mr. Lindell has focused on here today.

7           THE COURT:  I think focusing on the ones he's

8    focused on would be helpful, but if you have comments on the

9    others and you think you want to create a record on that,

10   that's just fine.

11          MR. JACOBSON:  Your Honor, I can speak very

12   briefly about the other ones, but walking through the

13   counts -- and it's been difficult, because Your Honor's --

14   I'm sure you've had a chance to read the reply brief, but

15   it's hard to map on what in the reply brief goes with which

16   count.  And it gets to one of the problems in this

17   litigation, which is that it's unclear where the different

18   arguments fall, which argument supports which count.  It's

19   been difficult to effectively counter this litigation where

20   we're at a bit of a loss to see what goes where, but here's

21   the best that we can do in terms of what Mr. Lindell is

22   claiming with regard to the different counts.

23          On Count 1 -- this is the First Amendment -- the

24   purported First Amendment violation.  This is -- ultimately

25   this count is -- it arises from the plaintiffs' view that

1    they're entitled to some kind of special treatment because

2    they speak on matters of public concern.

3             But the *P.J. Video* case that we cited in our brief

4    makes clear that it's the same standard in the First

5    Amendment context whether someone's speaking on matters of

6    public concern or not.  There's no heightened protection in

7    the Fourth Amendment context or insulation from

8    investigation on the basis of someone's First Amendment

9    speech.

10            The *Zurcher* case which we cited in our brief,

11   another Supreme Court case, provides that a search warrant

12   protects -- a search warrant and the procedures associated

13   with a search warrant protect against any potential First

14   Amendment harm, and that's exactly what we did here, Your

15   Honor.  We didn't -- we didn't just go into Mr. Lindell's

16   phone and take all of the -- I mean, we got a search warrant

17   for it, and that's what the *Zurcher* case makes clear, that

18   that is sufficient protection for someone's First Amendment

19   rights.  The target of the search warrant is not speech.

20   It's not Mr. Lindell's speech on matters of public concern.

21   It is very specific.  If Your Honor were to take a look at

22   the Attachment B about what it is that we believe -- that

23   the judge believed we had probable cause to seize, and that

24   again distinguishes the circumstances here from the ones in

25   the *In re Grand Jury Proceedings* case where it was

1    essentially limitless what the Government could take from

2    the bail bondsman.

3              As far as the warrantless collection of cell site

4    location information, which is Count 2, that was briefly

5    mentioned here today, suffice it to say, Your Honor, that

6    there is zero likelihood of success on this count and we can

7    explain why in an *ex parte* filing if that will be helpful to

8    Your Honor.

9              THE COURT:  That would be.  We'll address the

10   nature of that *ex parte* submission here when everyone's done

11   arguing.

12             MR. JACOBSON:  Okay.  With regard to Count 3, the

13   purportedly unreasonable search or seizure of Mr. Lindell's

14   phone, this is -- this was sort of the key argument here

15   today from Plaintiffs, which is that the warrant is

16   overbroad, the two-step process is unconstitutional.  You

17   need a search protocol, you need a special master, because

18   Mr. Lindell speaks on matters of public concern and so he

19   gets special treatment.

20             And this warrant first off looks like every search

21   warrant for a phone that I've ever done, and certainly

22   probably, Your Honor, that you've ever seen.  It is a

23   regular, standard practice search warrant.  It is not

24   overbroad.  It is highly particular.  It has a time period

25   that is -- I believe it's less than two years of information

1      that's sought.  There are enumerated offenses.  There is an

2      enumerated list of individuals who have to be involved for

3      us to seize the information.  In other words, if either

4      Mr. Lindell or this other individual is not involved, it

5      would likely exceed the scope of the warrant.  We couldn't

6      seize it.  There is a highly specific list of records that

7      we -- that Judge Leung found that we had probable cause to

8      seize.  It couldn't be much more specific about what it is

9      that we're entitled to seize under this warrant.

10            THE COURT:  All right.  So this reminds me of two

11     other questions that I had coming in here today, or

12     concerns.

13            If I go this route, have you thought through --

14     has the Government thought through the preclusive effect

15     that any ruling here might have down the road?

16            MR. JACOBSON:  If Your Honor were to make a

17     determination that there was a Fourth Amendment violation?

18            THE COURT:  No, that they're -- if I reject

19     constitutional claims asserted here, has the Government

20     thought through -- and Mr. Parker, I'm going to have the

21     same question for you -- a preclusive effect of I guess

22     whatever the decision is here down the road.

23            MR. JACOBSON:  I understand, Your Honor.  In terms

24     of suppression potentially, right?  For example, if

25     Mr. Lindell were to be prosecuted --

1           THE COURT:  Collateral estoppel.

2           MR. JACOBSON:  -- would he be barred from

3     litigating the issue again or would it be essentially a

4     litigated issue.  Your Honor, I haven't thought through that

5     issue.  I'm not certain how -- I'm not certain of the impact

6     of these -- that kind of pre-indictment litigation on

7     post-indictment suppression litigation.

8           THE COURT:  Well, it's -- the issue is whether

9     that counts as judicial restraint in the face of a lack of

10    precedent supporting the very nature of the claim that's

11    asserted here.

12          MR. JACOBSON:  I think that's fair, Your Honor.

13    It certainly could.  It certainly could.

14          THE COURT:  Okay.

15          MR. JACOBSON:  With regard to the argument that

16    Mr. Lindell has put forward regarding a specific protocol,

17    we have to have a specific protocol, the **Moulder** case calls

18    for a specific protocol.  The **In re iPhone** case calls for a

19    specific protocol.

20          First, the **Dalia** Supreme Court case is clear.  The

21    manner of execution of a warrant is discretionary by the

22    agents.  It still has to comply with the Fourth Amendment's

23    reasonableness standards.  And so if later down the line

24    there's evidence that the Government exceeded the scope of

25    the warrant in seizing material, Mr. Lindell has a remedy

1    and that's suppression.  But I think at a higher level not

2    only are those cases inconsistent with *Dalia*.  They're also

3    inconsistent with Eighth Circuit precedent, like the *Bach*

4    case that we cited in our brief which made clear that the

5    two-step -- which the two-step process was not directly

6    litigated, but the Eighth Circuit did determine in that

7    circumstance that a two-step warrant -- I think it was to

8    Yahoo in that case -- an ECPA warrant was appropriate.

9         I also think -- there is another case as well that

10   we ought to have cited in our briefs, Your Honor, but did

11   not, and that's *United States vs. Cartier*.  It's 543 F.3d

12   442.  That case directly addressed whether a specific search

13   protocol was necessary.  I believe that was a child

14   pornography case and the defendant was claiming that the

15   Government had essentially done exactly what Mr. Lindell is

16   claiming the Government is doing here, which is that it had

17   gone -- it had -- there was no system for the Government's

18   review in that case of computer materials, and the Eighth

19   Circuit rejected any kind of *per se* rule that a search

20   protocol was necessary.

21        I think Your Honor also noted that -- the D.D.C.

22   case, the *iPhone* case.  The magistrate judge, Judge

23   Facciola, has been reversed on similar issues by -- in

24   D.D.C.  And so, Your Honor, I think that those cases

25   ultimately are not even necessarily good law in D.D.C.

1    anymore.  I believe the Chief Judge overruled one of his

2    decisions, not this specific one, I don't believe, but a

3    different one, again finding unconstitutional the absence of

4    a search protocol and a two-step process.

5           I think also just thinking about *Moulder*, even if

6    *Moulder* were good law, what *Moulder* addresses is the

7    two-step warrant protocol in the context of a search warrant

8    to an electronic storage provider.  I think in *Moulder* -- I

9    can't -- I believe it was Google in *Moulder.*

10          So the judge is saying that the Government can't

11   just go to Google and get the whole account at step one and

12   then go through and pick out the specific things that are

13   responsive to the warrant at step two.  Even if that case

14   were correctly decided, implementation of that framework for

15   a search warrant for a cell phone is inconceivable.  Because

16   I could go to Google potentially and say, "You know what?  I

17   only have probable cause to seize the text messages and

18   let's say the Google Map information that you guys have

19   retained.  I don't have probable cause to keep anything

20   else, and maybe Google could provide me with those two

21   things."

22          But how would we do that with Mr. Lindell?

23   Presumably I would have to go to Mr. Parker and say,

24   "Mr. Parker, I have a warrant for Mr. Lindell's cell phone,

25   but could you please provide to me all of the messages that

1     are on there that I have probable cause for, as well as his

2     location history?  And I'll just take your word for it that

3     that's responsive to the warrant."  It's impossible to

4     implement that framework for a search warrant for a cell

5     phone.  And so even if Your Honor were inclined to accept

6     that *Moulder* is good law, which we strongly believe that it

7     is not in light of *Dalia*, in light of the *Cartier* case that

8     I just cited to Your Honor, in light of the fact that the

9     D.D.C. cases that it rests on have been determined to be bad

10    law even in D.D.C., it wouldn't matter, because that

11    framework is incompatible with the search of a physical cell

12    phone from an individual.

13            In terms of the repeated citations to *Riley* and

14    *Carpenter*, the Supreme Court decisions that highlight the --

15    how phones are private, how phones contain a lot of private

16    information, we don't deny that, Your Honor.  I have two

17    cell phones here and it's true that they contain a

18    significant amount of private information, not unlike

19    Mr. Lindell's phone, I'm sure.  It contains a lot of private

20    information, because like anybody else, the phone contains

21    medical information.  It contains information about -- you

22    know, about my relationships with other people, and it is a

23    private entity.

24            We respected his rights by getting this search

25    warrant.  That is what *Riley* and what *Carpenter* call for.

1     *Riley* says you can't seize -- you can't search a phone

2     incident to arrest.  You've got to get a warrant.  *Carpenter*

3     says you can't take historical cell site information without

4     a warrant.  We got a warrant.  That's what the Supreme Court

5     wanted us to do to protect individuals' privacy.  We

6     recognized that the phone is a -- is special and we

7     appreciated that in obtaining the warrant from Judge Leung.

8           As far as the -- and so that was -- to be clear,

9     Your Honor, I'm still walking through the counts.  That was

10    Count 3.

11           Count 4 is Mr. Lindell's allegation that he was

12    unlawfully seized and that agents did not use the least

13    intrusive means to seize him.

14           Mr. Lindell on the recording that Your Honor

15    heard -- or I'm not sure whether you've listened to it, but

16    we've cited the specific language on there.

17           THE COURT:  Your description of it.

18           MR. JACOBSON:  He says he's not under arrest.  He

19    says he's not under arrest.  He asked to be put under

20    arrest, "Arrest me.  The agents wouldn't arrest me."  So I'm

21    not sure how he can claim he's unlawfully seized, or how

22    Your Honor could determine on the basis of the record that

23    you have in front of you today, how there is a likelihood of

24    success on an unreasonable detention claim that in any event

25    wasn't briefed in the opening brief.

1              COURT REPORTER:  Mr. Jacobson, would you just slow

2      down?

3              MR. JACOBSON:  I'm sorry.  I'm sorry.

4              On Count 5, Your Honor, the due process claim, the

5      key argument that was briefed there was that we had withheld

6      material information from Judge Leung and that that was a

7      substantive due process violation.  There is no substantive

8      due process violation arising from withholding information

9      in -- perhaps there's some universe where that could arise,

10     but ultimately that's a Fourth Amendment issue.  And it's

11     been packaged here I think in paragraph 79 of the Complaint

12     as a Due Process Clause issue, and now on reply we're

13     hearing from the plaintiffs:  No, you've misunderstood us.

14     It's a Fourth Amendment argument.

15             But there's nothing that we can do -- we didn't

16     package the Complaint the way that Mr. Lindell packaged the

17     Complaint.  We didn't choose how to package the Complaint.

18     He packages it as a substantive due process violation, but

19     ultimately it doesn't matter.  Because even if it's a Fourth

20     Amendment claim, and even if Your Honor were to essentially

21     construe the Complaint the way you would construe a *pro se*

22     complaint and give it some kind of special treatment,

23     there's no Fourth Amendment violation here.  Because the

24     contention is that the specific information that he's

25     alleging we withheld, even if we withheld it, there's no

1    ability to meet the *Franks* standard in that context.

2         There's two -- the *Z.J.* case that the plaintiffs

3    cite articulates the standard for what you need to do to

4    establish a *Franks* violation based on the withholding of

5    material information in a search warrant affidavit.  The

6    facts have to be omitted with the intent to make or in

7    reckless disregard of whether they thereby make the

8    affidavit misleading, and the affidavit if supplemented by

9    the omitted information could not support a finding of

10   probable cause.

11        This Court can determine for itself and I don't

12   think I need to stand here and really argue that we ought to

13   have told Judge Leung that we had -- that the entire

14   Department of Justice had a conflict of interest and could

15   not investigate Mr. Lindell, and if only we had told Judge

16   Leung that he would have never issued this warrant.

17        So, Your Honor, there's no likelihood of success,

18   whether you package it under the substantive due process

19   framework under Count 5, or whether you construe it as a

20   Fourth Amendment claim.

21        I'm not going to hit on the irreparable harm and

22   public interest factors, really, because ultimately there is

23   no ability to establish irreparable harm based on the

24   arguments that Mr. Lindell has put forward, because it

25   exclusively rests on the likelihood of success on the five

1   claims.  The plaintiffs' argument primarily about

2   irreparable harm, even if you construe it most favorably, is

3   that we are chilling his -- we're chilling his rights and

4   every day that we retain that phone we're chilling his

5   ability to exercise his First Amendment rights.

6           The primary citation, I think, in Plaintiffs'

7   briefing on that issue is to the *Cuomo* case, a recent

8   Supreme Court case addressing COVID restrictions on worship.

9   In the *Cuomo* case, the court determined that a restriction

10  in the state of New York that limited in some circumstances

11  church attendance to ten people or fewer, that that was

12  unconstitutional and it violated the First Amendment, and

13  that every day that the plaintiffs in that case were denied

14  their right to worship was a violation of their First

15  Amendment rights.  Again, this -- circumstances here just

16  could not be more different.  Nobody is barring Mr. Lindell

17  from exercising his First Amendment rights.  The inability

18  to worship in your church, at your synagogue, at your

19  mosque, looks nothing like what happened to Mr. Lindell

20  here.  His phone was seized.  He's been talking nonstop

21  since that occurred.

22          On the public interest factor, Your Honor, the

23  public's interest is in effective law enforcement.  It's in

24  prompt resolution of criminal matters.

25          And unless Your Honor has anything else on the

1    freestanding constitutional claims, I'll move quickly to

2    some of the Rule 41(g) issues.

3              THE COURT:  I do not and I think that would be

4    helpful.

5              MR. JACOBSON:  Okay.  So, Your Honor, at the 41(g)

6    level, the court -- the Eighth Circuit has been clear -- and

7    this derives from that 1975 Fifth Circuit *Richey* case --

8    that there is equitable jurisdiction to entertain claims for

9    the return of property pre-indictment, and that's what rule

10   41(g) allows.  And so we're not hiding from the fact that

11   there is a potential remedy under 41(g) for an

12   unconstitutional seizure, or for a seizure that goes on for

13   too long, or for a seizure that's otherwise in callous

14   disregard of someone's rights, but ultimately it's a

15   balancing test.  And under the 1989 amendments to Rule 41,

16   they provide I think in the most clear language that where

17   the United States has a need for property in an

18   investigation or a prosecution, the retention of the

19   property is reasonable.

20              Mr. Lindell has the burden under the *Jackson* case

21   that Your Honor cited in the denial of *ex parte* relief here,

22   he has the burden to show why he's entitled to this property

23   and why the Government's interests in retaining that

24   property for purposes of its investigation are substantially

25   outweighed by his interest.

1              Under the Eighth Circuit's **Jackson** and **Fyler**

2    cases, again, I believe -- at least the **Jackson** case and the

3    **Black Hills** case were cited in Your Honor's order, but the

4    framework is clear.  There's four factors that need to be

5    looked at to obtain equitable jurisdiction.  There is

6    callous disregard of the individual's constitutional rights.

7    There's irreparable harm from failure to return the

8    property.  There's an individual interest and need in the

9    return of the property.  And there's got to be no adequate

10   remedy of law, no adequate remedy at law in absence of -- no

11   adequate remedy at law.

12             Turning first to the callous disregard factor,

13   under the **Fyler** case, the Eighth Circuit's **Fyler** case which

14   we cited repeatedly on our 41(g) briefing, getting a warrant

15   essentially means you're never going to have callous

16   disregard for the plaintiff's rights.  That's not -- it's

17   not definitive in that no matter what you get a warrant, it

18   automatically means no callous disregard, but it is a

19   significant factor establishing an absence of callous

20   disregard of a plaintiff's rights.

21             The **Richey** case, again, getting back to that Fifth

22   Circuit 1975 case that established this general framework

23   and that the plaintiff cites and relies on in his reply,

24   talks about what -- it distinguishes between two

25   circumstances, one that would and one that would not

1   establish callous disregard.  A factor that would establish

2   callous disregard is fraud in obtaining a warrant.  A factor

3   that would not establish callous disregard is where you're

4   merely claiming that the warrant is invalid.  I think it's

5   pretty clear where Mr. Lindell's claims fall on that

6   spectrum.  He's challenging the warrant.  He's not claiming

7   that there was fraud in obtaining the warrant.

8           Another good example comes from the **Black Hills**

9   case.  In the **Black Hills** matter you had Sue, the dinosaur,

10  which is currently in my hometown in Chicago, was unearthed

11  and the Government was retaining the dinosaur in callous

12  disregard of ultimately the public's entitlement to that

13  significant archeological finding.  The Government was

14  damaging the property and it's own expert, I believe, in

15  that case testified that the Government was damaging the

16  property.  That's callous disregard.  It's not satisfied

17  here.  There is no callous disregard.  And if you were to

18  embrace, Your Honor, the Eleventh Circuit's **Trump** decision,

19  callous disregard is essentially end-all and be-all for

20  purposes of establishing equitable jurisdiction here.

21          The second factor, irreparable harm, it's got to

22  be actual, it's got to be great, it's got to be imminent.

23  That's from the **Wilansky** case from this court, from the

24  District of Minnesota, and from the **Fyler** case.  Stigma

25  associated with the execution of a search warrant is

1    insufficient.  It's insufficient to justify -- to find

2    irreparable harm.  Here, we have followed the normal warrant

3    process.  We have implemented a filter protocol to protect

4    Mr. Lindell's attorney-client privilege.  There is no

5    irreparable harm.

6         As far as a need for the property, the *Pieper* case

7    -- that's another Eighth Circuit decision -- provides that

8    where an individual has copies of the seized material

9    there's no need.  Mr. Lindell has almost -- according to his

10   own declaration, he's got almost an exact copy of what the

11   Government took, and I've heard no reason to believe that

12   the small delta between what he has on the cloud and what

13   the Government took on the phone, which I think constitutes,

14   according to his declaration, something like six or seven

15   days' worth of data, why he needs that data within the

16   meaning of the 41(g) cases.  That certainly hasn't been

17   articulated here, only the fact that there is a small gap

18   between what he's got and what we have.

19        As far as an adequate remedy, he's got

20   suppression, and ultimately under the *Fyler* case and under

21   *Wilansky*, that's a sufficient remedy.  It may not be that it

22   is a sufficient remedy in every single case, but it is

23   certainly a sufficient remedy here.  The *Bennett* case, the

24   Southern District of Florida case that Mr. Lindell relies on

25   in his reply, similarly concludes that suppression is an

1    adequate remedy.

2              And so, Your Honor, ultimately for the reasons --

3    I want to raise one more issue quickly, and that's this

4    issue of the special master which was raised for the first

5    time on reply.  The Government had, of course, no

6    opportunity to respond to Plaintiffs' request for a special

7    master.  The request for a special master appeared nowhere

8    in the reply brief.  It's not in the Complaint, it's not in

9    the original motion for an injunction.  We've heard nothing

10   about a special master until the reply brief a couple days

11   ago, which left the Government at a severe disadvantage to

12   litigate that issue appropriately, to appropriately respond

13   to Mr. Lindell's request for a special master.  And so -- it

14   also seems to me, Your Honor, that the absence of that

15   request in the Complaint prevents Your Honor from granting

16   that relief, because relief in the preliminary injunction

17   order can't come outside of the Complaint.  The Eighth

18   Circuit has held as much.  And I can give a citation for

19   that if that will be helpful: 42 F.3d 470.  That's the

20   *Devose* case that relief can't be granted, and it's an

21   obvious rule, but it's worth the citation because that

22   relief is clearly outside the scope of the Complaint.

23             Mr. Lindell appears to want a filter not just for

24   attorney-client privilege.  I heard today and I sort of --

25   it's implied in the reply brief that he wants a filter for

1    his First Amendment protected activity.  I'm not aware, Your

2    Honor, and I certainly didn't see in the briefing of any

3    authority that would call for a special master or a special

4    master to review Mr. Lindell's First Amendment right.  That

5    is not a privilege in the manner that an attorney-client

6    communication is a privilege.

7         And so for that reason, for those various

8    different reasons, the appointment of a special master here

9    would be completely inappropriate.  Mr. Lindell is not

10   without remedies, and so Your Honor's -- Your Honor, a

11   determination that he can't succeed on his preliminary

12   injunction or that he can't succeed on his 41(g) motion does

13   not leave him without any tools to combat what he claims is

14   unconstitutional Government behavior.  Suppression he has.

15   He could potentially bring a *Bivens* action against the

16   agents.  We have strong reason to believe that that action

17   would be unsuccessful, but I want to be clear that we're not

18   suggesting that Mr. Lindell has no tools in his tool belt

19   and that the law provides no tools to combat

20   unconstitutional Government behavior.  Of course, there's no

21   unconstitutional Government behavior here.  This is standard

22   playbook Government action here, but there are tools and I

23   think I've articulated a few of them.

24        Mr. Lindell has claimed that we ought to have cut

25   a subpoena to him before we issued the warrant.  Your Honor

1    is uniquely aware more than perhaps any judge in the country

2    about what happens when subpoenas are issued for material

3    belonging to Mr. Lindell.

4              In the *Lindell vs. January 6th Committee* case,

5    which is assigned to you, Your Honor -- that's 22-CV-28 --

6    Mr. Lindell challenges the seizure -- or the January 6th

7    Committee's subpoena to obtain Verizon records.  Those

8    Verizon records presumably are toll records that would just

9    say:  "Call Out," "Call In."  If Mr. Lindell is challenging

10   a third-party subpoena that would provide only call records,

11   it is almost inconceivable that he would respond to a

12   subpoena seeking content that was called for by this

13   warrant.  Even if there were reason to believe that

14   Mr. Lindell would respond to a subpoena, would happily give

15   up all of the material that the Government asked for, it

16   wouldn't matter and it wouldn't let him obtain relief here,

17   because even in some of the cases that he's cited, courts

18   have determined that the issuance of a subpoena, along with

19   a warrant side by side, is perfectly permissible and not

20   inappropriate in any way.  There's no Justice Department

21   policy that bars the issuance of -- that bars subpoenas from

22   coming alongside warrants.  There are limitations in the

23   context of search warrants for attorneys and search warrants

24   for completely disinterested third parties that provide a

25   sort of presumption that the Government will try to get a

1    subpoena unless there's a unique circumstance or there's

2    reason to believe that property would be destroyed.

3    Mr. Lindell is not an attorney and he is not a disinterested

4    third party.  And so even to the extent that the Justice

5    Department manual -- or that the Justice manual describes

6    circumstances where subpoenas need to come before warrants,

7    they provide no right to Mr. Lindell and they're

8    inapplicable in any event.

9          So for those reasons, Your Honor, 41(g) relief is

10   inappropriate here and there is no likelihood of success on

11   any of the claims, no irreparable harm, and the public

12   interest strongly favors permitting the investigation to

13   play out and allowing the investigation to ultimately take

14   its course consistent with the **Deaver** decision and the

15   **Younger** decision from the Supreme Court.

16         For those reasons, Your Honor, relief should be

17   denied here.

18         THE COURT:  Thank you, Mr. Jacobson.

19         Mr. Parker, rebuttal?

20         Mr. Jacobson's right.  You don't ask for that

21   special master in your Complaint.  The reason I noticed that

22   is because the first time I saw a reference to the special

23   master request was in Mr. Dershowitz's *Wall Street Journal*

24   editorial, and I was a little surprised to see it there

25   because I didn't see it in the Complaint the day before.

1            Anyway, that's why --

2            MR. PARKER:  There are a number of things we

3    didn't ask for in the Complaint that might be a good

4    resolution.  Redaction I don't think we mentioned in the

5    Complaint either.  I don't think it needs to be asked for in

6    the Complaint.  It's one way in which we can deal with the

7    practicality that the Government might raise.  Ultimately

8    they did.  We responded with one way that we could do that.

9            That does not preclude this Court in its

10   conclusions determining that a special master would be the

11   appropriate way to deal with this, and it doesn't prejudice

12   the Government from making an argument about it, just like

13   they'd make an argument on redaction.  What is it that, you

14   know, needs to be litigated about that?

15           The central issue is that under **Moulder** and the

16   two-step process this warrant is a general warrant and that

17   the Government is now rifling through all of the material of

18   Mr. Lindell without any sort of boundaries to it other than

19   maybe a filter team as it relates to attorney-client

20   privileged information.  And the warrant that the judge

21   allowed them to gather information and look at doesn't cover

22   that material.  And so it is a general warrant and there has

23   been no response to that, none.  It's simply:  We have a

24   right to go through personal and private information of U.S.

25   citizens even though the court did not issue a warrant for

1      us to do that, and that is a general warrant.

2             THE COURT:  How about the preclusion principles

3      that I asked about earlier?  Have you thought about that?

4             MR. PARKER:  Yes.  The cases that we cite in our

5      brief I believe deal with *Younger*.  They deal with a

6      situation just like this when a warrant is unconstitutional,

7      done in bad faith.  You know, the Government wants to claim

8      that there is no evidence of bad faith here.  This isn't

9      like *Lewellen*, for example.  Well, there is plenty evidence

10     of bad faith.

11            Mr. Lindell has been a target for some time.  He's

12     been a target by political opponents who view him on one

13     side of the political spectrum and they're going after him.

14     Mr. Lindell didn't even know of Tina Peters and this

15     whole --

16            THE COURT:  My question's a little different.

17     It's sort of a, one could argue, a technical procedural

18     problem, but I do have some concerns about it.  You're

19     asking me to decide constitutional law questions as they

20     pertain to this warrant.  Will that resolution have

21     preclusive effect in the event those questions need to be

22     revisited down the road in some other context?

23            MR. PARKER:  At most in looking at Rule 65 and the

24     preliminary injunction posture that this Court sits with

25     today, the Court makes a determination --

1          THE COURT:  Okay.  That's a good point.  We're

2     dealing with a preliminary injunction.

3          MR. PARKER:  -- of likelihood of success.

4          And so it's not going to have a preclusive effect.

5     I think no matter what the Court rules, the Court should

6     make clear in its ruling that it is not intended, because I

7     think Rule 65 specifically states that the Court can make

8     that assessment and finding as a part of its ruling.

9          I want to go back to clarify, to the extent that

10    it needs to be clarified, 41(g), the Government made a big

11    point in suggesting that our Complaint was a *pro bono*

12    Complaint, or a *pro se* Complaint.  No, I don't think so.

13    41(g) is referenced in the Complaint.  It's suggested that

14    it isn't.  That's not true.  It is.  It is in the Complaint.

15    It is identified as one of the relief requests.  And then a

16    motion was brought under 41(g).  As the Court identified,

17    the foundation of the reasons for 41(g) being applicable are

18    the constitutional violations, and 41(g) references

19    unconstitutional conduct by the Government warrants a 41(g)

20    remedy.  And so the manner in which we have proceeded is the

21    appropriate manner under 41(g).  The Complaint meets those

22    standards by requesting 41(g) relief and by identifying the

23    grounds and the bases for the five counts, five different

24    constitutional violations that occurred.

25          So that's maybe a more fulsome response to the

1    Court's previous question regarding how the procedural

2    posture of this case gets into the constitutional analyses

3    that we have been focused on here today.

4              But in the end, I think the Court is correct that

5    it is a 41(g) analysis for the Court to determine, and in

6    order to do that the Court needs to look at the

7    constitutional arguments that we have raised and we believe

8    are very likely to succeed on first and foremost the general

9    warrant argument that has been entirely ignored, the **Moulder**

10   case basically ignored.  It has not been overturned.  It is

11   a decision by Judge Tunheim just a few months ago and it's

12   very similar.  Step one of the process is simply violated by

13   the way the Government went about this warrant.

14             I want to respond a few things said about the

15   First Amendment violations here and the fact that there's

16   been no callous disregard of Mr. Lindell's rights as it

17   relates to that constitutional amendment.

18             He's out there speaking and therefore he obviously

19   has not been chilled.  That isn't the standard, that

20   somebody is out there speaking.  The actions by the

21   Government create intimidation, intimidation for him and who

22   he associates with and for people who will not associate

23   with him.

24             And the reason is -- and I've experienced this and

25   I know this to be the case having been involved in these

1    cases, experts who say, "I've got all this info, but I won't

2    testify about it."  It happens all the time.  That's not the

3    way a democracy should work.

4         THE COURT:  Well, we gauge chill by conduct,

5    right?  That's one way we gauge it.

6         MR. PARKER:  And that's what I'm speaking to.

7    People are not associating who would otherwise associate

8    with these ideas because they're afraid, because they're

9    afraid of this theory without even looking behind the

10   curtain, the theory that electronic voting machines are

11   inappropriate to be married to the vote.

12        THE COURT:  Well --

13        MR. PARKER:  They shouldn't be counting and

14   tabulating.  And when -- I'm sorry.  I don't want to

15   interrupt you.

16        THE COURT:  Oh, no, it's okay, Mr. Parker.  I

17   didn't mean -- you can finish your thought.

18        MR. PARKER:  And there are strong political views

19   on either side, and this administration, this Justice

20   Department, as well as the FBI, but in particular the

21   Justice Department, has stated from the highest levels and

22   verbalized that those who take that position are supporting

23   domestic terrorists.  Those statements have been made.  And

24   it has an enormous impact on the First Amendment rights of

25   people who believe in that and who want to carry out those

1        beliefs through discourse, and that's what's happened.

2              Mr. Lindell would likely have been doing many

3        different things that he is not doing despite the fact that

4        people may believe, well, he's still being public about it.

5        He's still -- it's still a chilling effect on him, and more

6        so it is a chilling effect on his freedom of association,

7        and the manner in which this was done to Mr. Lindell and it

8        went public before he even went public underscores that

9        reality.

10             THE COURT:  But then you've got to -- I mean --

11       I'm not sure what to do with all that.

12             On the one hand, a criminal investigation

13       necessarily or almost always results in chill.  It isolates

14       the subject of the criminal investigation.  It doesn't

15       matter whether you're a felon in possession, a drug dealer,

16       or somebody charged with some other crime.  People by nature

17       then dissociate.

18             And I don't think that civic engagement insulates

19       one from proper criminal investigation.  So you've got --

20       what you're articulating are grounds for a subsequent ***Bivens***

21       action depending on how this all shakes out.  I don't

22       understand that what you're articulating under the law is a

23       basis to get the cell phone back via a preliminary

24       injunction in this case.  That's my concern.

25             How do you answer that?

1          MR. PARKER:  The balancing of the equities of the

2     criminal investigation that is being done, and the import of

3     the public political issues that are being debated, and the

4     import of making sure that people are allowed to make these

5     public statements and that are not attacked criminally in

6     bad faith because they are taking those positions is really

7     what we are talking about.

8          And how is it that it's in bad faith?  Well,

9     number one, there's maybe an indicator that it is because

10    the Government has taken such a different position and they

11    have indicated, you know, supporting or enabling domestic

12    terror.

13         But in addition to that, when you look at the

14    information that was provided to the magistrate judge in

15    this case, it was just kind of brushed aside by the

16    Government, that there was no fraud being asserted.  No.  If

17    you read Mr. Lindell's petition, he articulates a number of

18    facts which were not provided, to our knowledge -- and we

19    don't know this for sure; we're arguing with one arm or both

20    arms behind our back in that regard -- were not provided in

21    all likelihood to the magistrate judge, which basically

22    indicate why are you going after Mike Lindell?  Look at

23    these reports and they tell you what was going on in

24    Colorado at that time.  That information was withheld, we

25    believe.  And so to suggest, well, there's no allegation of

1    fraud in obtaining the warrant, that word may not have been

2    used, but the failure to provide important information, that

3    argument has been made and is in fact a part of the record.

4         The argument that Mr. Lindell has the burden to

5    show why the 41(g) elements are met here, that is

6    acknowledged and we have made the arguments that are

7    necessary.  They are in the construct of the constitutional

8    violations that we've talked about, but that burden has been

9    met.  And if there is a finding that in fact this is a

10   general warrant in the way that it was obtained and the

11   execution of it articulated a number of violations as we've

12   already argued, then there is irreparable harm.  The second

13   element is met.

14        The individual's interest.  I've talked about that

15   already.  Mr. Lindell has a direct interest, in fact, in

16   having not just his phone back, but more importantly his

17   information not being rummaged through by the Government and

18   that is an independent interest as well.

19        The argument that, well, this case is different

20   than *Moulder* because *Moulder* was a third-party email account

21   company, Google in that case, and they can do it, but how

22   are we supposed to do it.  We can do it with cell phones and

23   there can be a process in place.  And it can't just be,

24   well, we can have general warrants because we don't know how

25   to do, you know, keywords or do searching by appropriate

1    people and who's going to do it so that it passes Fourth

2    Amendment muster.  Getting a warrant is not sufficient.

3    Getting a warrant with safeguards and protocols in place is

4    what is required according to *Moulder*.

5              Thank you, Your Honor.

6              THE COURT:  Thank you, Mr. Parker.

7              I would note that we are six minutes over time

8    here.  Mr. Jacobson, let me give you just a couple of

9    minutes if you wanted to say the last word here.

10             MR. JACOBSON:  Your Honor, there's really nothing

11   further that I -- I don't want to interrupt lunch here, Your

12   Honor, so --

13             THE COURT:  No, you're not interrupting lunch.

14             MR. JACOBSON:  But I think it's -- I think we've

15   made the key point, and the key point is that this

16   litigation, this Complaint, is brought to enjoin a federal

17   criminal investigation, that that is inappropriate.  There's

18   been no showing of any disregard for Mr. Lindell's rights.

19             THE COURT:  All right.  While you're there, let me

20   ask if the Government has a suggestion as to how best to

21   submit the documents *in camera*.

22             MR. JACOBSON:  Your Honor, we could file a motion,

23   a limited motion that would just explain pursuant to the

24   Court's order, we are filing -- I believe it was -- this was

25   in response to Count 2 of the Complaint, correct, the count

1    involving cell site location information?

2              THE COURT:  How about the application materials?

3              MR. JACOBSON:  The warrant materials as well?

4              THE COURT:  That as well.

5              MR. JACOBSON:  Okay.  This would be my proposal,

6    Your Honor:

7              I could file a motion saying pursuant to the

8    Court's directive, the Government is seeking to file two

9    documents under seal, one in response to Count 2 of the

10   Complaint and one containing all of the search warrant

11   materials.

12             And then separately I'll file two attachments, one

13   responsive to the first issue, the second containing all the

14   search warrant materials.

15             And that would be the way I would propose to do

16   it, Your Honor.

17             THE COURT:  All right.  And you'd be filing

18   those -- well, I'll let you figure out the mechanics of it,

19   but you'd have to file those in a way that only I can access

20   and the plaintiffs cannot.

21             MR. JACOBSON:  That's right.

22             THE COURT:  Yes.  All right.  And if it's not

23   feasible to do that through CM/ECF, a hard copy submission

24   is appropriate, but I'll let you all figure that out.

25             All right.  I think that's all the questions I

1    have.  Thank you.

2              MR. JACOBSON:  Okay.  Thank you, Your Honor.

3              THE COURT:  All right.  The motions have been

4    fully briefed and argued.  It's under advisement.  We will

5    get a decision out as promptly as we can.  I appreciate

6    everyone's thorough attention to the issues and the argument

7    today and the briefing that was submitted beforehand.  It's

8    helpful.

9              As I say, it's under advisement, we'll get a

10   decision out as quickly as we can, and we are adjourned.

11             Thank you, everyone.

12             (Proceedings concluded at 12:11 p.m.)

13                    *      *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.

*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224